**BRASCO, INC., Plaintiff,**

v.

**INTERNATIONAL GRAPHIC SERVICES, INC., Defendant.**

No. 83 C 9494.

United States District Court, N.D. Illinois, E.D.

Oct. 23, 1984.

---

John A. Relias, Richard F. Zehnle; Vedder, Price, Kaufman & Kammholz, Chicago, Ill., for plaintiff.

Louis Pretekin, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Brasco, Inc. ("Brasco") sues International Graphic Services, Inc. ("IGS") for breach of contract (Count I) and fraud (Count II). On April 20, 1984 this Court denied IGS' motion to dismiss or strike Count II. Brasco now moves under Fed.R.Civ.P. ("Rule") 56 for summary judgment on Count I. For the reasons stated in this memorandum opinion and order, that motion is granted.

### Facts[1]

In November 1982 IGS contracted with the Regional Transportation Authority to install and thereafter to maintain, at suburban bus stops in the Chicago area, passenger shelters equipped with advertising panels. In turn IGS contracted to purchase the shelters and panels from Brasco,[2] which agreed to supply up to 1,000 shelters and 379 extra panels at the rate of at least 45 shelters and 15 panels per month beginning in February 1983. Agreement ¶ 3(a) set the terms of payment at thirty days net from the date of each delivery unless IGS then owed Brasco at least $100,000, in which event Agreement ¶ 3(b) required:

> For all shipments which, when aggregated with prior shipments, leave the buyer indebted to the seller in amounts greater than $100,000.00: cash on delivery.

On December 22, 1982 Brasco shipped a prototype shelter unit to IGS, followed by 5 units on February 2, 1983, 20 units on March 7, 45 units and 15 extra advertising panels on March 31 and 5 additional advertising panels on April 7. On April 29, May 3 and May 11 Brasco shipped the component parts for an additional 65 units.[3] Brasco however withheld shipment of the dome roof sections for 13 of those units after IGS' $50,000 check had been dishonored by the bank for insufficient funds.

Thus Brasco shipped IGS a total of 136 units, of which 123 were complete and 13 lacked only the dome roof section. IGS has yet to pay for the major share of the goods shipped. At the end of February 1983 it tendered a partial payment of $1,259.38. During early April it sent another part payment of $7,700, leaving it indebted to Brasco for another $95,530.22. Brasco accordingly notified IGS any further monthly shipments would be made only on a cash basis as Agreement ¶ 3(b) provided.

On April 28 a Brasco representative conferred with IGS Chairman Eugene P. Rosciano ("Rosciano"). That meeting generated a $50,000 IGS check post-dated to May 10, in reliance on which Brasco made the April 29, May 3 and May 11 shipments (bringing IGS' total indebtedness to $164,-649.92). When timely presented, the check

---

1. Familiar Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmovant. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984). To the extent IGS seeks to controvert the facts recited in this section (which are stated in conformity with those principles), the later text discussion deals with IGS' contentions.

2. Though the IGS-Brasco Agreement (the "Agreement") is dated January 1, 1983, it was not actually executed until April 18 of that year. Because most of the relevant dates were during 1983, dates referred to in this opinion without any year designation occurred in 1983.

3. Advertising panels were omitted from 20 of those units because IGS had decided to use, for that purpose, the 20 extra panels shipped on March 31 and April 7.

was dishonored and Brasco thereupon ceased all shipments to IGS.

In a June 17 letter Brasco notified IGS it would have to assess interest charges at the rate of 18% per annum on all past due amounts. According to the affidavit of Brasco General Manager Thomas J. Lennon ("Lennon") IGS thereafter made payments of $2,469.75 and $7,875.43, representing accrued interest through August 31 (Lennon Aff. ¶ 16).[4] IGS has made no further payments on its obligation under the Agreement. On December 27 Brasco filed this action.

### Summary Judgment Analysis

On those facts Brasco argues it is entitled as a matter of law to judgment on Count I for $164,649.92 plus interest at 18% per annum from September 1, 1983. IGS does not dispute the *fact* of its obligation to Brasco under the Agreement. Instead it challenges the *amount* of that obligation because, it says:

1. IGS received only 117 units, not 136 as Brasco contends.

2. IGS is entitled to set off damages resulting from Brasco's failure to deliver goods conforming to its obligations under the Agreement.

3. IGS did not agree and is not obligated to pay interest on any past due balances.

IGS offers each of those contentions as establishing the existence of an issue of material fact sufficient to defeat Brasco's motion. This opinion will consider them in turn.

### 1. *Number of Units Shipped*

In support of its assertion that it received only 117 bus shelter units, IGS cites only Rosciano Aff. ¶ 4:

**4.** Both parties have been extraordinarily casual in their approaches to Rule 56(c) and 56(e) requirements. IGS tenders Rosciano's "affidavit," which clearly does not conform to the first sentence of Rule 56(e) in a number of respects. Brasco (which should remember it has the evidentiary burden) simply attaches a number of document photocopies to its memoranda, apparently unmindful of the need to treat documents just as it would exhibits sought to be admitted at trial—after all, summary judgment is really a

Brasco shipped no more than one hundred seventeen (117) shelters during the relevant period herein.

By contrast Brasco describes in some detail (Lennon Aff. ¶¶ 10–14) the circumstances surrounding the April 29, May 3 and May 11 shipments—the only ones allegedly in dispute. But there is more: Brasco submits copies of its bills of lading for those three shipments, directly confirming that the component parts of 65 shelters (20 without advertising panels and 13 without dome roof sections) were in fact shipped.

Once a movant has met its burden of establishing that there is no genuine issue as to a given material fact, the burden shifts to the nonmoving party to show an issue remains for the factfinder. *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir. 1983) (citations omitted) teaches:

To create a question of fact, an adverse party responding to a properly made and supported summary judgment motion must set forth specific facts showing that there is a genuine issue for trial.... A party may not rest on mere allegations or denials of his pleadings; similarly a bare contention that an issue of fact exists is insufficient to raise a factual issue.... Rule 56 of the Federal Rules of Civil Procedure clearly requires that an adverse party set forth specific facts showing a genuine issue for trial.

See also *Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984).

■ IGS clearly has not generated a genuine factual issue as to the number of units shipped. In light of Brasco's showing,[5] IGS had to provide specific evidentiary support for its counter-assertion. Rosci-

substitute for trial (except for the resolution of factual disputes). To avoid the further delay of sending the parties back to the drawing boards, this opinion has proceeded on the reasonable assumption Brasco will take the necessary formal steps (via supplemental affidavits) for admissibility of those documents.

**5.** But see the last sentence of n. 4.

ano's conclusory affidavit statement is not even a makeweight to that end.

## 2. *Defects in Units Shipped*

IGS says the shelters shipped by Brasco were defective in three respects:

1. Some of the units were delivered with badly scratched posts.

2. Locking devices provided to prevent members of the public from tampering with the advertising panels were inadequate.

3. Anchor clips provided with the shelters were not large or strong enough to keep the shelters from opening and collapsing.

Here too IGS mistakes its evidentiary burden: Rosciano's affidavit sets out "facts" in a way no witness could do from the stand, substituting instead a kind of generalized conclusory narrative.[6] Nonetheless this opinion will—for the moment—assume arguendo the claimed flaws in the goods exist. If so their legal effect must be determined by reference to the Agreement and to the provisions of the Uniform Commercial Code ("UCC") as adopted in Michigan.[7] Mich.Comp.Laws §§ 440.1101–440.-9994 (cited as "Section" following by the last four digits of the section number).[8]

Because IGS plainly accepted the units Brasco shipped (see Section 2606), IGS' right to a remedy for claimed breaches is governed by Section 2607(3)(a), under which a buyer who has accepted the tender of goods:

> must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.

In turn Section 1204(1) provides:

> Whenever this act requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement.

Those statutory provisions must be considered in light of Agreement ¶ 15, which states:

> The Buyer shall be deemed to have accepted the goods in as is condition unelss [sic], within ~~five thirty~~ 10 days after delivery to the Buyer's warehouse, Buyer notifies the Seller in writing of defects.

That indisputably satisfies Section 1204(1), particularly where the parties specifically negotiated and agreed upon the need for written notice and its time requirement.[9] Moreover the contractual provision that the notice be in writing is both appropriate and

---

**6.** This Court is left with the strong suspicion IGS' counsel has not read or does not understand Rule 56 (or both). For example the "response" to Brasco's summary judgment motion treats it as though it were a complaint, offering the following extraordinary kind of presentation (only a representative sample is included):

1. Defendant admits the allegations contained in ¶ 1.

2. Defendant admits the allegations contained in the first sentence of ¶ 2, but makes no response to the allegations contained in the second sentence, having insufficient knowledge to form a belief as to the truth or accuracy of the allegations contained therein.

\* \* \* \* \* \*

8. Defendant admits the allegations contained in the first sentence of ¶ 8, but denies the allegations contained in the second sentence therein.

\* \* \* \* \* \*

12. Defendant denies that it owed Plaintiff any sum whatsoever as and for interest.

That lack of attention to the entire concept of Rule 56 carries forward into the Rosciano "affidavit."

**7.** Agreement ¶ 10 provides:

> This contract shall be governed by the Laws of the State of Michigan.

For purposes of this Court's earlier opinion as to Complaint Count II, the parties agreed Illinois law provided the rule of decision (Opinion 3 n. 2). Given the Agreement's choice-of-law provision, Brasco's contract claim should be controlled by its terms, and both parties' supplemental memoranda do look to Michigan law.

**8.** Because of the Michigan statutory numbering system, correlation of the Michigan citation with the UCC itself requires only the insertion of a hyphen. Thus for example Section 1204(1) corresponds to UCC § 1–204(1).

**9.** No clearer example of a negotiated contract term could be imagined. Its original typed version was the five-day requirement. That was stricken manually and a handwritten "thirty" inserted in its place. Then "thirty" was lined out, "10" was written in, and the principals of the contracting parties initialed the interlineation.

enforceable. Section 1102(3)–(4); see also *Prompt Electrical Supply Co. v. Allen-Bradley Co.*, 492 F.Supp. 344, 347–48 (E.D. N.Y.1980). Though the UCC does not mandate written notice, the parties have a reasonable interest in providing by agreement for the existence of a written record in the event their dealings under the contract become the subject of litigation. See 3 Hawkland, *Uniform Commercial Code Series* § 2–607:07, at 70.

As to the scratched posts, IGS clearly fails the Agreement ¶ 15 requirement. Rosciano Aff. ¶ 7 says only "he notified Brasco of the scratches immediately upon receipt by IGS of the shelters." That may carry with it a reasonable inference of timeliness, but surely *not* one of written notification (IGS tenders no supporting document).

IGS does point to Brasco's having shipped spray paint to be used for touching up the posts (Def. Ex. II).[10] But that is not at all inconsistent with Agreement ¶ 15's "as is" provision. Indeed Rosciano Aff. ¶ 11 confirms (though it cavils at) the fact Brasco charged IGS for the touch-up paint. Clearly Brasco did not interpret any notice it arguably received as triggering any obligation to cure the scratches. Contrast *Reinhardt v. Bennett*, 45 Mich.App. 18, 205 N.W.2d 847, 852 (1973) (defendant's response on three occasions to complaints about defects in swimming pool raised question as to waiver, through a course of dealing, of contract's written notice requirement).

Thus no genuine factual dispute even arguably undercuts Agreement ¶ 15 as to the scratched posts. Section 2607(3)(a) bars any remedy on that score.

IGS' second issue, the asserted inadequacy of the advertising panel tamper-proof devices, might perhaps pose more difficulty. There Rosciano did write Brasco on April 18 (Def. Ex. I):

> We are in agreement that the screw is much too short and may create a hazard to the general public. We currently have 23 units on the street and certainly wish to avoid any possible liabilities incurred by this insufficient locking system.
>
> Please advise what necessary steps Brasco will take to remedy this situation.

In terms of any contractual *duty* arguably owed by Brasco, that letter is ambiguous: It might represent either a demand for performance or (in light of Rosciano's February 25 letter referred to later in this paragraph) merely a request for Brasco's assistance in meeting IGS' risks. But viewed most favorably to IGS (that is, as a demand) the April 18 language is certainly "sufficient to let the seller know that the transaction is still troublesome and must be watched" (Section 2607, Official Comment 4), so Agreement ¶ 15's requirement of written notice would be satisfied. As to the timeliness issue, however, IGS had been shipped a prototype shelter on December 22, 1982 and an additional five units on February 2, 1983. On February 25 Rosciano wrote to Lennon (Pl. Ex. B):

> This will serve as confirmation and acceptance of the prototype delivered to International Graphic Services on your Shipper No. 03–09367 dated February 2, 1983.
>
> The conditions and specifications of the bus shelters being purchased from your company are totally acceptable.

That set of facts could conjure up some legal complexities:

1. As to Brasco's early shipments the 10-day notice provision was plainly not met. Thus the question would become whether 10 days was "manifestly unreasonable" under the circumstances (Section 2607(3)(a)).

2. As to Brasco's post-April 8 shipments the notice was timely *if* the April 18 letter were an effective notice. Thus the question would become whether IGS' February 25 acceptance of the prototype precluded a later-asserted claim of a de-

---

**10.** It is not clear that the scratches were a problem on any but the six units that constituted Brasco's first two (December 22, 1982 and February 2, 1983) shipments. Brasco included the touch-up paint as part of its third shipment to IGS.

fect, common to the prototype and to all later shipments, under Agreement ¶ 15.[11]

Fortunately this Court need not ring all the changes suggested by those hypotheses, for IGS' conduct *before* this lawsuit stimulated its imagination provides the definitive answer. On July 6—long after the April 18 letter, indeed after Brasco had terminated the Agreement for IGS' breach—Rosciano wrote Brasco directly acknowledging IGS' obligation for the contract amount, with no hint of any offsets for alleged defects in the goods (App. 1). In fact Rosciano there confirmed IGS' willingness to pay for Brasco's unshipped units in inventory "at our agreed upon price." Both IGS' unequivocal recognition of full contract liability in the July 6 letter and the like tone of Rosciano's letters of October 25 (App. 2) and November 16 (App. 3)[12] give the lie to IGS' current afterthoughts of allegedly defective merchandise. In fact that is reconfirmed by IGS' payments of interest in full on account balances that Brasco had clearly calculated in terms of the *full* sale price of the goods shipped.

These matters conclusively negate any notion IGS is reasonably entitled to the inferences drawn arguendo in the earlier discussion. Whether perceived in terms of the absence of any claim or as the waiver of any arguable claim, IGS' own conduct belies its current efforts to evade its just obligations.

Precisely the same analysis controls IGS' remaining claim that the anchor clips are inadequate to keep the shelters from collapsing. Here IGS offers Rosciano's vague (and improper under Rule 56(e)) affidavit statements (Aff. ¶¶ 16, 18):

16. That several of the shelters have collapsed, and IGS has been informed on one such occasion, a man was hit in the head by one of the collapsing shelters.

\* \* \* \* \* \*

18. That as soon as the inadequacy of the anchor clips was discoverable by IGS, he informed Brasco of it and has discussed the problem with Brasco on numerous occasions but Brasco has made no effort to replace the anchor clips.

Again IGS' own previously-discussed conduct—confirming its obligation to Brasco with no suggestion of any such claims—torpedoes its current effort to manufacture a basis for non-payment of the obligation it has acknowledged. And on this topic (unlike the one just discussed in earlier paragraphs) IGS also failed to satisfy Agreement ¶ 15's written notice requirement in any event. It is thus doubly defeated.

### 3. *Obligation To Pay Interest*

Finally IGS urges it is not obligated to pay interest on any unpaid balance under the Agreement because it never agreed to do so. Indeed Rosciano says (Aff. ¶¶ 20–21):

20. That there is no agreement between Brasco and IGS for the payment of interest on the principal balance, if any, owed by IGS to Brasco.

21. That any amounts paid by IGS to Brasco were intended by me to be payments on the principal, if any, due Brasco.

To be blunt, that statement of Rosciano's "intention" is simply a lie. On June 17 Brasco wrote Rosciano it would begin assessing interest at 18% per annum on outstanding balances.[13] On July 6 Rosciano wrote to Lennon (App. 1):

---

11. Agreement ¶ 6 might or might not bear on that subject.

12. As the November 16 letter reflects, Brasco's October 30 computer-generated billing was plainly incorrect: It included a mistaken double billing of an $81,859.70 invoice plus two erroneous rebillings of $3,697.65 each (those items, aggregating $89,255, account for the difference between the $164,649.92 Brasco now correctly claims and the $253,904.92 incorrectly shown in the October 30 statement). But what is signifi-

cant is that on November 16 Rosciano correctly challenged the statement amount only in terms of "materials not received," with not even a whisper of any defects in the goods or any right to offsets or credits.

13. It will be remembered Agreement ¶ 3(a) established net 30 day terms. Of course that necessarily implies any unpaid balances will bear interest (else the contract language is rendered meaningless). All that remains, then, is to determine the applicable interest *rate*.

I am sorry to hear of your decision to terminate our agreement. I am sending you the interest you had requested on monies due per our last conversation.... Upon completing our arrangements, we will pay Brasco the total amount due plus any interest owing at that time.

Again in his November 16 letter (App. 3) Rosciano referred specifically to "interest" and to "a credit to our company on interest money paid for materials not received." [14]

It is not proper to weigh conflicting evidence on a motion for summary judgment. But a court is not obligated to credit a litigant's statement of his claimed intention (by definition a subjective statement incapable of verification) that flies so squarely in the teeth of the litigant's own prior unequivocal statements and conduct. See 10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2727, at 163–65, 170 (1983):

> And, although the court should refrain from assessing the probative value of the material presented, evidence in opposition to the motion that clearly is without any force is insufficient to raise a genuine issue.
>
> \*   \*   \*   \*   \*   \*
>
> [T]he evidence offered must have the force needed to allow a jury to rely on it and the court may disregard an offer of evidence that is too incredible to be believed.

██ So the *fact* of IGS' interest payments is beyond dispute. As for its *obligation* to make such payments, n. 13 identifies the source of such an obligation in contract terms. Even were that not the case, the law is clear that a creditor may recover interest for default in timely payment of a liquidated indebtedness, though the contract does not provide for interest. See 47 C.J.S. Interest & Usury § 27, at 75–76.

██ True enough, in cases where interest is proper but the parties have not agreed upon a rate, the computation should be made at the legal rate.[15] See *Gottesman v. Fay-Bea Construction Co.,* 355 Mich. 6, 94 N.W.2d 81 (1959) (per curiam). Corporations, however, may agree in writing to pay interest in excess of the legal rate. Mich.Comp.Laws § 450.1275. Here the correspondence between the parties, including IGS' actual payments of over $10,-000 in interest at the 18% rate, clearly reflects such an agreement unless:

1.  other evidence creates a material factual dispute or

2.  the agreement is legally unenforceable for some reason.

██ As to the first of those possibilities, IGS has nothing to put in the scales except Rosciano's statement of a different intention. For the reason already explained, that is unworthy of credit even in the summary judgment context. As for the second possibility, IGS seeks to invoke either a lack of consideration or a Statute of Frauds defense. Neither holds water:

1.  Of course Brasco suffered a detriment: It did not receive the current payment to which it was entitled under the Agreement. Indeed the Agreement itself, which included the implied promise to pay interest on past-due balances (see n. 13), is a paradigm of consideration: a promise for a promise.

2.  Agreements to pay interest are not, as such, covered by the Statute of Frauds. Even if they were, though, the writings signed by IGS (for example, its July 6 letter *and its interest checks themselves*) would do the job. And the same writings satisfy the agreement-in-writing requirement of Mich.Comp.Laws § 450.1275.

### Conclusion

It distorts the justice system when parties concoct factual disputes to defer (or avoid entirely) their financial obligations. As long as Brasco held off on suing IGS for its six-figure obligation, IGS was sweet-

---

**14.** See n. 12.

**15.** In Michigan the legal rate is 7% per annum. Mich.Comp.Laws § 438.31.

ly reasonable. It acknowledged its indebtedness, paid interest when it could, referred to its own financial problems and held out the prospect of meeting its obligations to Brasco. For example:

On July 6: "Upon completing our arrangements, we will pay Brasco the total amount due plus any interest owing at that time. I am sending you this check to prove our good faith and assure you that we do intend to complete our obligations."

On October 25: "We do realize our financial obligation to Brasco and have been working diligently to fulfill our agreement."

On November 16: "As we have discussed, please set up a payment schedule showing an initial $50,000 deposit on merchandise and balance to be paid in monthly increments not to exceed 24 months. As you know, International Graphic Services has always been concerned with the responsibility owed to your company."

Once in the courts, though, IGS has sought to manufacture issues without foundation in the relationship between the parties. Rule 11 in its most recent incarnation speaks to such efforts. But for current purposes, suffice it to say there is no *genuine* issue of material fact as to Brasco's Count I, and Brasco is entitled to a judgment on that count as a matter of law.[16]

### APPENDIX 1

July 6, 1983

Mr. Tom Lennon
Brasco, Inc.
32413 Park Lane
Garden City, MI 48135

Dear Tom:

I am sorry to hear of your decision to terminate our agreement. I am sending you the interest you had requested on monies due per our last conversation. We are sorry for any inconvenience we have caused Brasco, Inc. Upon completing our arrangements, we will pay Brasco the total amount due plus any interest owing at that time. I am sending you this check to prove our good faith and assure you that we do intend to complete our obligations.

On your last visit you had indicated you had units in your inventory. We are willing at this time to pay for these units at our agreed upon price so Brasco is not burdened with unnecessary inventory.

Again, we accept your termination and am sorry for any inconvenience. We do have a viable program and as I told you on your last visit, we had no problem until the financial institution came in to check inventory only to find incomplete shelters. Putting no blame on Brasco or anyone, it did not appear to their better interests to finance a program and pay for material which was not in the possession of International Graphic Services. We have, in fact, overcome this situation and we will be forwarding you a check for the total amount due.

We will wait to hear from you regarding the shelters you have advised are in your inventory. If you should desire to change your mind in regards to termination of this contract with IGS, we would be more than willing to have a fresh start. Until that time, we will consider our contract null and void.

Sincerely,

Eugene P. Rosciano
Chairman

EPR:fmc

Enclosure

### APPENDIX 2

October 25, 1983

REGISTERED MAIL—RETURN RECEIPT REQUESTED

Mr. Marshall V. Noecker
Brasco, Inc.
13271 Mt. Elliott
Detroit, Michigan 48212

---

**16.** As n. 4 reflects, this assumes Brasco will promptly file the appropriate documents to place formally into evidence the exhibits attached to its memoranda.

Dear Marshall:

We are in receipt of your letter of October 12, 1983. We certainly apologize for Mr. Siepmann's promises as we were unaware of them until our discussions with Tom Lennon.

Your belief in International Graphic Services and our project is obvious as it does hold tremendous potential for both our companies. We can become the largest bus shelter advertiser in the country and Brasco, Inc. can surely become the largest bus shelter manufacturer in the country.

We do realize our financial obligation to Brasco and have been working diligently to fulfill our agreement. A temporary mortgage situation as you suggest in your letter would be a positive step in the right direction for both companies. We request an additional ten days from this date to give us an opportunity to work out the details of this alternative.

We will wait to hear your reply, and hopefully our companies can become one in working toward a common goal.

Sincerely,

INTERNATIONAL GRAPHIC SERVICES, INC.

/s/ Eugene P. Rosciano
Eugene P. Rosciano
Chairman

EPR:sc

APPENDIX 3

November 16, 1983

Mr. Marshall V. Noecker
Brasco, Inc.
13271 Mt. Elliott
Detroit, Michigan 48212

Dear Marshall:

In accordance with our recent conversation, please find enclosed a copy of your recent statement dated October 30, 1983.

Please be advised that International Graphic Services, Inc. does not owe Brasco $253,-904.92 which said interest is based upon. At this time we request an itemized list of monies owed, and a credit to our company on interest money paid for materials not received.

As we have discussed, please set up a payment schedule showing an initial $50,-000 deposit on merchandise and balance to be paid in monthly increments not to exceed 24 months.

As you know, International Graphic Services has always been concerned with the responsibility owed to your company. We hope you will give this matter your immediate attention and look forward to a more compatible working relationship.

Sincerely,

INTERNATIONAL GRAPHIC SERVICES, INC.

Eugene P. Rosicano

EPR:sc
Enclosure