QUAKER ALLOY CASTING CO., Plaintiff, Counterclaim Defendant, Third–Party Plaintiff,

v.

GULFCO INDUSTRIES, INC., Defendant, Counterclaim Plaintiff, Cross–claim Plaintiff,

v.

CONSOLIDATED FOUNDRIES & MANUFACTURING CORPORATION, Third–Party Defendant, Cross–claim Defendant.

No. 85 C 1212.

United States District Court, N.D. Illinois, E.D.

May 24, 1988.

David L. Doyle, Mary K. Rochford, Therese A. Dynia, Thomas P. Cimino, Jr., Phelan, Pope & John, Ltd., Chicago, Ill., for plaintiff, counterclaim defendant, third-party plaintiff.

James K. Toohey, Arthur F. Radke, Sean M. Sullivan, David R. McCort, Ross & Hardies, Chicago, Ill., (David W. Rutledge, Nashville, Tenn., of counsel), for defendant counterclaim plaintiff, cross-claim plaintiff.

David S. Barritt, Chapman and Cutler, Chicago, Ill., for third party defendant, cross-claim defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

This painfully complicated case (at least in factual terms) involves a dispute over castings produced for a manufacturer of oil-drilling valves. Quaker Alloy Casting Co. ("Quaker"), an unincorporated division of Harsco Corporation ("Harsco"), has sued Gulfco Industries, Inc. ("Gulfco") in a two-count Complaint seeking (1) payment for castings already delivered and (2) specific performance of Gulfco's obligation to take and pay for goods ordered and not yet delivered. Gulfco has filed counterclaims against Quaker and cross-claims against third-party defendant Consolidated Foundries & Manufacturing Corporation ("Consolidated"), the former owner of Quaker's investment casting operation, for breach of express and implied warranties for goods previously delivered.

Quaker has now moved for summary judgment under Fed.R.Civ.P. ("Rule") 56 on its Complaint and has jointly moved with Consolidated[1] for summary judgment on Gulfco's counterclaims and cross-claims.

In addition, each of Quaker and Gulfco seeks sanctions against the other under Rule 11 (with Quaker also claiming entitlement under 28 U.S.C. § 1927 ("Section 1927")) for various filings in the case to date.[2] For the reasons stated in this memorandum opinion and order:

1. Quaker–Consolidated's motion for summary judgment is denied.

2. Quaker's summary judgment motion is granted in substantial part: It is successful on its comparatively small claim in Complaint Count I and as to the work-in-progress component of Complaint Count II. Its Count II motion is denied as to the balance of the claim asserted there.

3. Quaker's motion for sanctions is granted in part and deferred in part.

4. Gulfco's sanctions motion is deferred for later resolution.

### Facts

Given the nature of the pending motions, it would be unwieldy to essay a total exposition of the facts at this point. Instead the essential background information will be provided here, with additional facts set out at pertinent points in the substantive discussion. At the outset, the corporate cast of characters comprises:

1. Consolidated, a Delaware corporation headquartered in Illinois at all times relevant to these motions;

2. Casting Engineers ("Casting"), originally an unincorporated operating division of Consolidated located in Niles, Illinois;[3]

3. Quaker, already identified as an unincorporated division of Harsco,[4] a De-

1. In the parties' memoranda Quaker and Consolidated have been referred to collectively as "Movants." With the multiple motions now at issue (including one by Gulfco), use of that term could engender confusion. Instead this opinion will employ "Quaker–Consolidated" (used as a plural noun) in referring to their joint actions or statements.

2. Consolidated originally joined with Quaker in its motion for sanctions. Then a conflict-of-interest dispute arose with Gulfco over a lawyer who had formerly been employed by counsel

for Gulfco but is now working for the law firm representing Consolidated. To avoid having to deal with that complication, Consolidated withdrew from the effort to impose sanctions on Gulfco.

3. As explained later in the text, Quaker acquired the Casting operations from Consolidated in August 1983.

4. For simplicity, this opinion will refer only to Quaker unless it is specifically necessary to re-

laware corporation with its principal place of business in Pennsylvania; and

4. Gulfco, an Oklahoma corporation with its principal place of business in that state.[5]

Diversity jurisdiction thus existed between Quaker (that is, Harsco) and Gulfco at the commencement of this action, and the later injection of Consolidated (a second Delaware corporation) did not destroy the original diversity (see *Owen Equipment & Erection Co. v. Kroger,* 437 U.S. 365, 375–77, 98 S.Ct. 2396, 2403–04, 57 L.Ed.2d 274 (1978)).

In 1981 discussions began between Casting and Gulfco as to Casting's possible production of components for Gulfco to use in its valves for the oil and gas drilling industry. Golf buffs (among others) will recognize the process employed by Casting: "investment casting" (see G S.J. Mem. 3[6]). Gulfco provided Casting with drawings and specifications as to dimensions, material and heat treatment, and Casting produced price quotations for 33 different parts for several sizes of two different valves produced by Gulfco—the GO and the G2B valves. Though the parties dispute exactly how the order was placed by Gulfco and what documents or conversations constitute the operative offer and acceptance for purposes of establishing the terms of the contract(s), there is no question that at the end of November or the beginning of December 1981 Gulfco placed orders for the 33 different parts. Those orders were subject to Gulfco's approval of samples, which Casting then proceeded to produce.

Approval sessions for the samples were held in approximately February 1982. Again there is a dispute as to which deviations from the specifications or drawings Gulfco approved at that time. For some of the parts, Gulfco's approval was conditioned on changes or corrections to the samples. Only after samples were approved did production of the parts actually begin (Q–C 12(e) ¶ 15).

One of the facts the parties do not dispute is that the bottom dropped out of the oil production market in 1982, creating a drastic impact on Gulfco's sales and orders. Gulfco quickly fell behind on its payments to Casting. Because of that delinquency, in September 1982 Casting stopped initiating production of any new parts for Gulfco, and in December it ceased production entirely (Q–C 12(e) ¶ 24). Negotiations then ensued between Gulfco and Consolidated. Gulfco owed Consolidated (leaving aside the issue whether nonpayment might be justified by any alleged defects in the parts) for goods already delivered. Gulfco also appeared obligated for goods ordered and not yet delivered: finished castings not yet shipped, castings in various stages of production and parts on which production had not yet started.

Quaker–Consolidated insist they and Gulfco discussed quality problems at the time of those negotiations over Gulfco's financial difficulties (Q–C 12(e) ¶ 25). Gulfco disputes the extent of involvement of quality issues during the financial negotiations, but it is undisputed that the parties discussed acceptance criteria for the parts

fer to an action by Harsco as an entity or to a Harsco representative.

5. In 1979 Ingram Industries ("Ingram"), a privately held corporation headquartered in Tennessee, acquired a 50% equity interest in Gulfco. In 1983 Ingram bought out the remaining interest in Gulfco, which then became known as Ingram Petroleum Services, Inc. To avoid even further confusion, this opinion will still use the name "Gulfco" throughout.

6. At this point a quick guide to the parties' filings cited in this opinion is in order. Each citation will refer first to the first letter of the litigant's name ("Q" for Quaker, "G" for Gulfco, "C" for Consolidated and "Q–C" for the Quaker-Consolidated joint submissions), then to the mo-

tion for which the document was filed ("S.J." for Summary Judgment, "Strike" for Quaker-Consolidated's Motion To Strike or Otherwise Disregard the Affidavit of Edward V. Bravenec, and "Sanctions" for the cross-motions for sanctions), then to the memorandum and page. Thus a typical reference will read "G S.J. Mem. 3" or "Q–C Strike R. Mem. 20." This opinion will also refer to the parties' submissions under this District Court's General Rules 12(e) and (f), setting out their respective positions on the existence of disputed material issues of fact. Those references will begin with the relevant initial(s) (such as "Q–C"), followed by "12(e)" or "12(f)" and then "¶ —."

and other technical issues during 1982 and 1983 (see G S.J. Mem. 13–14).

According to Gulfco, it reached an agreement in principle with Consolidated in early 1983 under which the amounts then due would be converted into a promissory note and Gulfco would also agree to purchase its casting requirements from Casting for three years (G S.J. Mem. 39). At that point, however, Ingram purchased the remaining interest in Gulfco and injected additional capital into the operation. Gulfco was then able to work out a different agreement with Consolidated, executed in May 1983. Under the Agreement To Modify Purchase Order Commitments (the "Agreement," G Ex. 51[7]):

1. Gulfco paid Consolidated $585,702.65.

2. Consolidated cancelled the purchase orders for goods on which production had not started.

3. For the goods on which production had at least started, Gulfco agreed to take the finished goods and the work-in-progress.

Gulfco then issued three superseding purchase orders reflecting the inventory of parts held by Casting and rescheduling delivery of the finished goods and the work-in-progress for 1984 through 1986. Consolidated acknowledged receipt of the orders on Gulfco's forms.

There is a sharp dispute over interpretation of the Agreement, primarily as to its third element. Quaker–Consolidated insist Gulfco agreed to take the work-in-progress "as is," meaning without any warranties. Gulfco asserts "as is" merely meant it agreed to take the goods *without any further processing,* saying the price for the goods was pegged at 65% of the original price to reflect the average stage of completion of the parts.

On August 11, 1983 the cast of characters expanded when Consolidated sold the Casting assets to Harsco for its Quaker division (G Ex. 59). Before closing with Consolidated, Harsco requested and received written confirmation of Gulfco's obligations under the Agreement. That took the form of a letter by Consolidated's Vice President John Dickey ("Dickey") acknowledged by Gulfco's Comptroller Ronald Kozak ("Kozak") (Q–C Ex. N). That document too is read differently by the parties, with Gulfco insisting (1) it was not meant to confirm that the work-in-progress was purchased without warranties and (2) it was not an enforceable modification to that effect. On August 10, 1983 Kozak reconfirmed Gulfco's commitment to the new purchase orders, this time without any reference to the terms (Q–C Ex. CC).

In September 1983 a new inventory of the parts held by Casting was conducted, yielding a different count. Accordingly the parties modified the purchase orders to reflect the new accounting. In 1984 Casting's delivery of parts to Gulfco resumed, beginning with the finished parts, with the uncompleted goods set to follow in 1985 and 1986.

G S.J. Mem. 47–49 asserts that beginning in late 1983 Gulfco became aware of the defective nature of Casting's goods. As Gulfco's production picked up again, it had accelerated its inspection of the parts (its increased quality screening was also motivated by problems with other Gulfco products not involving Casting components). Before that, Gulfco's inspection of the goods consisted of visual inspection on receipt (to identify patent dimensional defects), with additional inspection occurring as the parts were used in the assembly of valves (G S.J. Mem. 76–77).

**7.** This is the first reference to any exhibit included among the parties' filings. Unfortunately they have not been particularly consistent in labeling their submissions, so this opinion will follow its own format. It will refer to affidavits, sworn statements and depositions by the name of the individual and the type of document (e.g., "Smith Aff. ¶ —"). As for the documents submitted by Quaker–Consolidated in two separate appendices (one listed by letters A to HH and the other by numbers 1 to 19), this opinion will refer to "Q–C Ex.—." Quaker has also included documents (designated by letters A to H) in its sanctions submission, and those will be cited "Q Sanctions Ex.—." Gulfco's documentary submissions are an easier matter—a single set of exhibits numbered 29 to 75, to be referred to as "G Ex.—."

During late 1983 and early 1984 Gulfco and Casting renewed their discussions over acceptance criteria for the parts and over Casting's willingness either to cure the problems or to accept returns. Then in August 1984 Casting wrote Gulfco a letter in which it specifically refused to take any more returns, saying Gulfco's rejection of the parts was untimely (Casting said it had accommodated Gulfco during the latter's slow business period by accepting rejects during a 12–month period after shipment, rather than imposing Casting's standard requirement of 30 or 60 days' written notice of rejection). Gulfco ultimately sent a December 7, 1984 letter refusing to accept or receive any further shipments from Casting (Gulfco says the letter was occasioned by its concern over Casting's refusal to address the quality problems).

In February 1985 Quaker filed its Complaint here against Gulfco, asserting its claim for goods already delivered in 1984 (now calculated at $25,309.98, Q S.J. Mem. 3) and those Gulfco had committed to take through 1986 (valued at $529,055.47, *id.*). Gulfco answered and counterclaimed in July 1985, stating a claim for $500,276 for breach of express warranties, implied warranties of merchantability and implied warranties of fitness for particular purposes. In November 1985 Gulfco amended its Answer and asserted a fourth counterclaim, charging Quaker had breached the contract by failing to produce components with the agreed-upon chemical and mechanical properties and heat treatment specifications and by failing to provide proper certifications of those properties.

Quaker answered Gulfco's original counterclaims in August 1985 (and then supplemented its Answer in December). Quaker also impleaded Consolidated as a third-party defendant, claiming Consolidated was contractually obligated to Quaker if the latter were found liable to Gulfco. Shortly thereafter Gulfco filed a cross-complaint against Consolidated mirroring its counterclaims against Quaker (those cross-claims were similarly amended in December). Consolidated answered in December 1985 by asserting a counterclaim against Quaker for indemnification and advancing numerous affirmative defenses against Gulfco.[8]

One final development should be noted at this juncture: On August 2, 1986 Gulfco formed a partnership with Cactus Wellhead Comp. That partnership, known as Ingram Cactus Co. ("Ingram Cactus"), became the transferee of various assets from Gulfco. Quaker–Consolidated contend those assets included all the inventory Gulfco now claims is defective, thereby affecting its rights against Quaker–Consolidated. Gulfco says it intended to transfer only nondefective assets to the new entity.[9]

### Summary Judgment Standards

Despite their familiarity, Rule 56's standards merit restating for their potential impact on the current motions. Three interrelated principles are basic to the analysis:

1. As movants for summary judgment Quaker and Consolidated bear the burden of proof: They must demonstrate the absence of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986)).

2. "Materiality" of a factual dispute turns on the fact being outcome-determinative. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) phrased that concept this way:

> Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.

8. Consolidated also attempted to assert counterclaims against Gulfco, but they were dismissed by this Court's February 5, 1986 order. This Court found Consolidated was essentially trying to recover its expected attorneys' fees, a claim that (1) was not cognizable at common law and (2) was premature if claimed under a possibly applicable Oklahoma law.

9. Quaker has also changed form since the filing of this action. Harsco sold its Quaker Alloy division and liquidated the assets constituting Casting, although holding on to the Gulfco-designated inventory and various related records (G S.J. Mem. 52). Gulfco has claimed no rights emanating from that liquidation, and this opinion will treat it as irrelevant to the case.

3. In evaluating the factual record this Court must draw inferences in Gulfco's favor, but "only reasonable inferences, not every conceivable inference" (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir.1987)).

Despite their burden as movants, Quaker–Consolidated can also prevail if Gulfco has failed to present evidence sufficient to establish an essential element of its case against them (*Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). As *Beard v. Whitley County REMC*, 840 F.2d 405, 410 (7th Cir.1988) (emphasis in original) put it recently:

> [W]hen confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a *genuine* issue of material fact which requires trial.

Relatedly, a nonmovant such as Gulfco can also lose if the evidence it does present is insufficient as a matter of law. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)) has reconfirmed that facet of the analysis:

> Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party there is no "genuine issue for trial."

*Matsushita* also teaches "metaphysical doubt" about the material facts of a case is insufficient to preclude summary judgment (*id.* 475 U.S. at 586, 106 S.Ct. at 1356; see also *Beard*, 840 F.2d at 409–10).

**10.** Ascertainment of the applicable law is essential only when it is outcome-determinative (see *Zurich Insurance Co. v. Heil Co.*, 815 F.2d 1122, 1123 (7th Cir.1987)).

**11.** Were choice of law relevant, it appears different answers would be given to different aspects of the case. Some of the documents specifically call for the application of Oklahoma law:

1. Agreement ¶ 6 designates construction and enforcement under that law (G Ex. 53 ¶ 6).

## Choice of Law

Even though choice of law should be the first order of business in any dispute involving more than a single state, the litigants here have touched that subject only briefly (Q–C S.J. Mem. 8–9, G S.J. Mem. 55 n. *). All parties agree, however, that (1) only Illinois or Oklahoma law is conceivably applicable and (2) the law of those states is in harmony as applied to this dispute. Both have adopted the relevant portions of the Uniform Commercial Code ("UCC") governing this sale of goods, and they have no apparent disagreements in their interpretation of relevant portions of the UCC.[10] Moreover, in light of the UCC's universal adoption the litigants have cited freely to a variety of jurisdictions, and this Court has generally done the same in search of useful or persuasive authority.[11]

## Summary Judgment Contentions

This opinion will first address the Quaker–Consolidated motion for summary judgment on the Gulfco counterclaims and cross-claims. It will then turn to Quaker's motion for summary judgment on its own Complaint. Finally this opinion will consider the appropriateness of sanctions at the present time. Before it does so, however, it will summarize the parties' contentions on the Rule 56 motions.

As for the Quaker–Consolidated motion, it offers two separate categories of argument:

1. Gulfco has provided insufficient evidence that the goods it received were in fact defective.

2. Gulfco's purchase order form, which controls as to the 1984–86 purchases (a matter discussed later in this opinion), specifies that Illinois law applies to its construction (G Ex. 74 ¶ 16). As to matters not within those agreed designations, Illinois' "most significant contacts" approach to the choice of law (see *Palmer v. Beverly Enterprises*, 823 F.2d 1105, 1107 (7th Cir. 1987)) seems to point to the application of Illinois substantive law. UCC § 1–105(1) similarly suggests the applicability of Illinois law in view of the case's "appropriate relation" to this state (see 1 Hawkland, *UCC Series* § 1–105:04 (art. 1)).

2. Even were that not so, there are a variety of ways in which Gulfco has waived its claims or failed to satisfy preconditions to its action.

On the first of those topics Quaker–Consolidated have (a) presented an assortment of evidence showing Gulfco's defect claims are unsupported and (b) moved to strike (or to have this Court disregard) the affidavit of Edward Bravenec ("Bravenec"), presented by Gulfco to substantiate its claims of defect. On the second topic Quaker–Consolidated have asserted:

(a) Gulfco's warranty claims were excluded by the operative contract terms between the parties.

(b) There are no implied warranties of merchantability or fitness for a particular use in this transaction.

(c) Gulfco accepted the goods (indeed, it did so with knowledge of the defects now sued upon), and it failed to revoke its acceptance in a timely fashion.

(d) Gulfco failed to give the requisite notice that the goods were defective and that Quaker-Consolidated had breached the contract between the parties.

(e) As a matter of law, the Agreement operates as an "accord and satisfaction" to bar Gulfco's claims.

Gulfco responds to the first Quaker-Consolidated position by contending (a) genuine disputed issues of fact exist over whether the Casting goods are conforming (for which purpose the Bravenec affidavit is admissible) and (b) its claims have not been waived or otherwise precluded as a matter of law. On the second topic Gulfco takes issue with each of the five assertions by Quaker–Consolidated.

As for Quaker's own Complaint, its motion for summary judgment asserts:

1. Gulfco cannot reject the shipped finished goods because the defect claims are unsupported (the same argument it makes in opposition to Gulfco's counterclaim).

2. All work-in-progress was sold to Gulfco "as is," negating any claim for defects.

3. Even if some of the goods delivered to date are defective, that doesn't justify wholesale rejection of all further goods ordered.

Gulfco retorts to each of those arguments:

1. It urges (as it did on its own counterclaim) that the defective condition of the goods is genuinely in dispute.

2. It says it did not agree to purchase the work-in-progress without warranties.

3. It claims its discovery of defects to date supports its right to cancel delivery of all further goods.

### Gulfco's Claims of Defect

Gulfco identifies a number of claimed defects in the Casting goods (G S.J. Mem. 59–72):

1. Some of the parts have unacceptable "surface pitting."

2. Chemical and physical properties of the parts are out of specification.

3. Material certifications of the parts are unreliable and improper.

4. There is a dimensional defect in the "stem adaptors."

5. All the parts are unmerchantable and unfit for their intended purpose.

In light of the huge amount of discovery undertaken to date, Gulfco's evidentiary support for many of its claims is dangerously thin. Its position is even more precarious given the considerable evidence submitted by Quaker–Consolidated that the parts are conforming and that Gulfco used them without a problem until the oil industry recession. Because the burden on the issue is Gulfco's, the condition of the goods is potentially dispositive of both summary judgment motions. If Gulfco has not sufficiently put in issue that the goods are defective, it loses now on both its counterclaim and its defense to Quaker's action.

But Gulfco survives that first hurdle—albeit barely in several areas. With the benefit of all inferences running in Gulfco's favor, and with this Court barred from resolving credibility disputes on such motions, it is constrained to find disputed issues of fact exist as to the condition of the Casting parts. That conclusion requires a good deal of explanation.

### 1. *Bravenec Affidavit*

At the outset it is necessary to address the admissibility of the Bravenec affidavit, a significant part of the evidence (though not the only evidence) of defect submitted by Gulfco.[12] Quaker–Consolidated move to strike the affidavit or have it disregarded because (1) Bravenec is not qualified as an expert on the matters to which he attests and (2) his opinions are based on assumptions not supported by the record. Those objections succeed only in part.

#### A. Bravenec's Qualifications

■ Bravenec's affidavit and his attached resume set out his extensive qualifications as a metallurgical engineer and quality control expert. Bravenec Aff. ¶ 3 speaks of his 32 years of experience with products made for the oil and petrochemical industries. Nonetheless Quaker–Consolidated say Bravenec's credentials do not qualify him as an expert in the foundry industry generally or investment casting specifically. Because Rule 56(e) limits this Court's consideration to admissible evidence, it is necessary to resolve that question (see *Bulthuis v. Rexall Corp.,* 789 F.2d 1315, 1318 (9th Cir.1985)).

Bravenec is unquestionably qualified to perform quality assurance tests on the parts and relate the results. His experience in the oil and petrochemical industry also renders him competent to testify as to minimum standards of merchantability and fitness of parts manufactured for use in the drilling industry (see *Baumholser v. Amax Coal Co.,* 630 F.2d 550, 551 (7th Cir.1980)). And although his experience does not extend to investment casting as

such, Quaker–Consolidated have failed to demonstrate that certification techniques and standards are different in investment casting from those in the steel industry in general (G Strike Mem. 5). With the benefit of the required favorable inferences, Gulfco is therefore also entitled to have Bravenec's opinion considered (at least at this stage) as to the chemical and material certifications provided by Casting for Gulfco.

#### B. Foundation for Bravenec's Opinions

■ Quaker–Consolidated also challenge Bravenec's conclusions about defects in the Casting parts because, they say, his opinions are necessarily based on assumptions contrary to uncontested evidence in this case. Except for Bravenec's conclusions about a "hardness" defect in the goods and the required carbon content of some of the castings, this Court finds his conclusions are based on facts at least genuinely in dispute in this case.[13]

Of course an expert's opinion must have a "reasonable factual basis" (*American National Bank and Trust Co. of Chicago v. K–Mart Corp.,* 717 F.2d 394, 399 (7th Cir.1983)). In the Rule 56 context, that means a court can grant summary judgment over an expert's testimony based on unsupported assumptions (*Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 672–73 (D.C.Cir.1977)). But it also means the court cannot ignore an opinion based on matters that, while not necessarily unchallenged, are at least a matter of genuine factual dispute.

On that score Bravenec Aff. ¶ 16 says 78.6% of the grade CA15 parts [14] showed a

---

12. Gulfco also argues at length that Casting's problems in manufacturing parts for another valve company, Quality Valve, are probative as to the goods manufactured for Gulfco (G S.J. Mem. 11–13, 15–19). Quaker–Consolidated correctly point out the evidence establishes that the parts cast for Quality Valve, though similar, were of different design from the Gulfco parts (Q–C S.J. R. Mem. 41–42). There is no real evidence that the Quality Valve dispute sheds any light on the condition of the Gulfco parts. That is not the type of "reasonable inference" this Court is required to draw in Gulfco's favor (*DeValk Lincoln Mercury,* 811 F.2d at 329).

13. This section of the opinion will deal with only part of the attacks on Bravenec's affidavit. Other aspects, which duplicate the Quaker–Consolidated arguments for summary judgment on the defect issue generally, will be discussed later (when that subject is considered).

14. Casting parts were to be made from three different types of stainless steel: ASTM grade CA15, AISI 316 and AISI 4140. ASTM (the American Society for Testing and Materials) and AISI (a professional abbreviation the parties have not defined) designate the specifications for different grades of alloys.

hardness reading above or below the appropriate level. Bravenec Aff. ¶ 17 goes on to cite that as one of the factors meriting rejection of the parts. But Quaker–Consolidated point out Bravenec's failure to take into account the fact that hardness problems can be ameliorated by additional heat treating and other methods (Q–C Strike Mem. 9). Gulfco has not responded and has submitted no evidence that hardness problems could not be thus cured consistently with industry practice. Accordingly Bravenec's conclusions as to alleged hardness nonconformities will be ignored.

Bravenec Aff. ¶ 16 also presents evidence that the CA 15 and 4140 parts are outside the chemical specifications set for those materials. One of the assumptions Bravenec makes (Aff. ¶ 15) is that the CA15 parts must contain between .10% and .175% carbon. Q–C Strike Mem. 8 asserts there was no lower limit set for carbon by industry standards. G Strike Mem. 12 n. 8 responds that a lower limit was set not by industrial standards but by agreement between the parties—a contention that rests wholly on a memorandum written by Casting's Richard Charlton (G Ex. 42). But that document shows that Gulfco *requested* a lower limit for carbon, not that the parties agreed upon such a standard. Bravenec's conclusions based on that alleged nonconformity are therefore unsupported and will also be disregarded.

Quaker–Consolidated level a number of other objections at the Bravenec affidavit based on the inherent unreliability of its conclusions (see Q–C Strike Mem. 10–11), but those matters go to the weight—the persuasiveness—of the evidence rather than its admissibility (see *Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 575 (5th Cir.1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979)). Again the summary judgment posture of the case saves Gulfco, and the affidavit will

not be stricken (cf. *Jorman v. Veterans Administration*, 579 F.Supp. 1407, 1412, 1413 n. 11 (N.D.Ill.1984)).

With the Bravenec affidavit thus in hand, this opinion turns to Gulfco's specific claims of defect. Genuine disputed issues exist in several areas.

2. *Surface Pitting*

Many of the parts Casting manufactured for Gulfco are gates and seats for the GO and G2B series valves. Proper operation of the valves depends on a tight seal between the gates and seats, which control the flow of material through the valve.[15] Gulfco claims its agreement with Casting was that the sealing surfaces of the gates and seats would be defect-free without any pitting.[16] Quaker–Consolidated contest that claim, saying:

1. Pitting was allowed on the GO gates and seats because the sealing surface on those parts was actually a coating applied to the casting, which masked any surface defects.

2. Pitting on the G2B gates became a problem only when Gulfco tried to use those gates in a new series of valves—the G3B valves—that required a higher quality sealing surface.

Quaker–Consolidated have presented considerable evidence that the gates and seats are conforming. Simply stated, their theory is that Gulfco was entirely satisfied with those parts (and with all the others now at issue) until demand for its valves dried up. At that point, they say, Gulfco belatedly tried to discover illusory grounds to reject parts it no longer needed. Gulfco's rejoinder, also in abbreviated form, is that it only lately discovered the defects in the parts, that defect-free sealing surfaces have been part of the agreement all along and that it is entitled to enforce that requirement.[17]

Quaker–Consolidated undoubtedly have a strong case that surface pitting is not actu-

---

**15.** G S.J. Mem. 7–8 explains how a gate valve operates and how gates and seats interact.

**16.** "Pitting is a condition of depressions or 'negatives' on the surface of the casting" (Q–C 12(e) ¶ 13 n. 6).

**17.** In part Gulfco also contends that even if the G2B gates worked with some surface pitting, compliance with the (alleged) no-pitting agreement was essential to cause the parts to function in the G3B series valves (see Steven Burrows ("Burrows") Aff. ¶ 5). Gulfco may well have the right to enforce a claimed express

ally a defect. Gulfco used a large number of the parts without a problem (though Gulfco says only after careful screening), it returned very few parts to Casting as defective and it received no customer complaints. Quaker–Consolidated also have produced evidence that the parts did not have to be produced without any pitting on the sealing surfaces (see Anthony Leonard ("Leonard") Dep. 203, John Kleeschulte Dep. 61–62).

But Gulfco has responded with at least some evidence that pitting is a defect on both the GO and G2B series valves. Gulfco engineer Burrows Aff. ¶¶ 2–3 states that sealing surfaces even on the GO parts were to be free of defects and that not all those parts were to be coated in such a way as to mask surface defects. There is also evidence that no pitting (also referred to as porosity problems) was allowed on the G2B gates (see Burrows Dep. 41, Leonard Dep. 48–49; see also Robert Reaves Dep. 105–06).

Unquestionably there is contrary evidence in the record from other participants, and sometimes even from the same witnesses, showing there was not a pitting requirement on all the parts (see Leonard Dep. 203–04). However, on a summary judgment motion the *comparative* strength of the parties' positions does not control— this Court cannot weigh the evidence and assess the credibility of witnesses (*Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510). Gulfco's evidence suffices to create a disputed issue as to whether defect-free sealing surfaces were a casting requirement. That being so, the Bravenec Aff. ¶ 16(a) statement that 63.5% of the gates and seats have sealing surface pitting is enough to put in issue the defective condition of the GO gates and seats and the G2B gates.

### 3. *Nonconforming Chemical and Physical Properties*

Various industry standards (see n. 14) set the required chemical composition of the parts produced by Casting. Bravenec's chemical analysis (Bravenec Aff. ¶ 16) indicates the CA15 and 4140 parts may be nonconforming: He found 13.7% of the CA15 parts [18] and 83.9% of the 4140 parts are outside the specifications. Bravenec Aff. ¶ 18 opines that renders all the parts cast of those materials rejectable, because Gulfco would have to verify the composition of the parts piece by piece at great expense.

That evidence suffices to create a genuine factual issue over the chemical content of the Casting parts (except for parts made of Grade 316 steel, on which Bravenec draws no conclusion). Though Quaker–Consolidated have argued Bravenec's affidavit is generally inadmissible, they have not attempted to dispute the affidavit's creation of a genuine issue over the chemical properties of the parts. As already noted, the Quaker–Consolidated arguments about the unreliability and statistical inaccuracy of Bravenec's analysis go to the weight of that evidence, not its admissibility.

Gulfco has also presented evidence that the G2B gates are nonconforming because of a condition known as "internal shrink" (porosity inside the casting). G Ex. 46, a Casting memorandum, indicates that 56% of the G2B gates had unacceptable internal shrink. Casting engineer David Holzmann ("Holzmann") confirmed that (1) the same defect would potentially apply to all G2B gates, (2) the cause of the problem was not corrected until after production of the parts ceased and (3) he didn't know if all the defective castings had been scrapped (Holzmann Dep. 61–69).[19] All that is

warranty such as a defect-free sealing surface, but it remains to be seen whether it effectively waived such a requirement by accepting and using G2B gates without complaint, knowing of the sealing surface condition (see UCC § 2–607(3)).

**18.** This figure does not factor in a required minimum carbon level for those parts—a requirement this opinion has already found unsupported by the evidence.

**19.** Bravenec also tested 12 parts for internal defects, finding 10 of them defective (Bravenec Aff. ¶ 16(h)). Quaker–Consolidated Strike Mem. 11 contests the statistical validity of such a small sample. Although Gulfco also submitted the opinion of a statistics expert to the contrary (Bruce Cooil Aff. ¶ 3), it says Bravenec drew no "global conclusion" from that evidence in any event (G Strike Mem. 8 n. 7). Whatever the weakness (or strength) of the Bravenec evi-

enough, when coupled with pro-Gulfco inferences, to put in issue an internal shrink defect in the G2B gates.

### 4. *Improper and Inaccurate Certifications*

Casting furnished Gulfco a sworn certification of the composition of each group of castings. Such certification is a material part of the contract (see Leonard Dep. 111–12; Q–C 12(e) ¶ 14). Gulfco now claims the certifications it received are defective because they don't certify the material used to produce the castings. Quaker–Consolidated respond Gulfco got precisely the type of certification for which it bargained.

Purchasers such as Gulfco have a choice of the type of certification deliverable with castings. Thus a manufacturer may be required to certify the chemical composition of each batch (also known as a "heat") of metal as it is poured—a foundry heat certification (Q–C 12(e) ¶ 14 n. 7). Another (and less expensive) certification covers only the "master heat," roughly understood as the composition of the metal purchased by a manufacturer that will be melted to form the casting (see G S.J. Mem. 25–26). Master heat certification is different because chemicals are added to the mix with each foundry heat to keep the material within the relevant specifications (see Robert Zugehar ("Zugehar") Dep. 249). Here Casting was to supply Gulfco with master heat certification.[20]

Gulfco has submitted evidence that Casting's master heat certifications are defective. Casting would certify the composition of material purchased from its supplier if that material met specifications, or Casting would certify the first pour from its own casting process if additional materials were necessary to bring the mix within specification (Zugehar Dep. 247–51). However, Casting would regularly add internally generated scrap or "revert" to the materials purchased from outside vendors (see Leonard Dep. 78–85, G S.J. Mem. 26). With revert added, Casting's master heat certification might not reflect the true composition of the material.

Quaker–Consolidated say Gulfco clearly knew revert would be used and what the certification would reflect (see Leonard Dep. 78–85). They allege Gulfco agreed, in order to save money, both to the use of scrap and to certification that would therefore not reflect the actual composition of each and every piece cast (Q–C 12(e) ¶ 14).

In response, Gulfco says Casting was operating under an incorrect definition of master heat certification, buttressing that position with Bravenec's attestation that Casting's definition is not consistent with industry understanding (Bravenec Aff. ¶ 21; see also Holzmann Dep. 197–99, stating Casting's definition of master heat was different from any he'd known in the industry).[21] Gulfco has also submitted Wagner Aff. 3 ¶ 17, which says Gulfco was expecting "master heat certification as generally defined in the foundry industry with which we had been dealing."[22]

Again Gulfco averts summary judgment. It has put into issue whether Casting's definition of master heat certification was consistent with general foundry industry practice and whether Gulfco in fact agreed

---

dence, it need not be taken into account to find an issue exists over internal shrink.

**20.** G S.J. Mem. 66 claims that there is also a question of fact whether it agreed to accept master heat certification. But it has presented no evidence that it contracted for foundry heat certification—indeed its own purchasing agent Albert Wagner ("Wagner") attests to Gulfco having agreed to master heat certification (Wagner Aff. 1 ¶ 11). Though the parties have submitted two further affidavits by Wagner (Aff. 2 of Dec. 17, 1987 and Aff. 3 of Jan. 7, 1988), neither contradicts his statements that Gulfco agreed to master heat certification (Wagner Aff. 3 ¶ 17). There is no genuine issue on that point.

**21.** Bravenec Aff. ¶ 21 also says master heat certification is not acceptable under ASTM standard A217, by which the CA15 parts were to be cast. Quaker–Consolidated Strike Mem. 6 points out that ASTM A217 allows the parties to reach their own understanding of master heat certification (see Daniel Twarog Aff. ¶¶ 9–10). That exposes the Gulfco contention as nothing more than a straw man.

**22.** Wagner insisted in one of his earlier affidavits that Gulfco knew just what it was getting in the certification (Wagner Aff. 1 ¶¶ 9, 11). During the eventual trial, the real Wagner will have to stand up.

to accept a modified form of master heat certification.[23]

### 5. *Stem Adaptor Defects*

Gulfco presents a final material defect: [24] It says the cross-holes in the GO stem adapters are misaligned (G S.J. Mem. 69). Quaker–Consolidated recognize that as a material variation from Gulfco's design specifications, but they contend Gulfco waived that nonconformity during the approval of samples (Q–C S.J. Mem. 16–17; Leonard Stmt. 17–18).

Gulfco has provided enough evidence of nonwaiver during sample approval to survive summary judgment now. Gulfco Engineer Burrows Aff. ¶ 4 asserts the condition was not discovered until months after receipt of the parts. That statement contradicts the evidence from Quaker-Consolidated and creates a disputed factual issue.[25]

### *Whose Contract Terms Control?*

■ This Court has been tendered a confused picture bearing on precisely how the parties formed their contracts [26] for the parts and just which contract documents control the transaction. Both those inquiries are critical to the outcome of (at least) the Quaker–Consolidated defense to the majority of Gulfco's counterclaims, because the Casting standard-form price quote (Q–C Ex. F) and order acknowledgement (Q–C Ex. K) contain terms that would bar Gulfco's action for damages. On the front of each form is a statement that it is subject to the terms and conditions found on the reverse. On the reverse side, each form contains an identical set of terms and conditions, including provisions that state:

1. Actions for breach of contract damages must be brought "within one year after the cause of action has occurred" (¶ 1).

2. Remedies under Casting's express warranties are limited to repair, replacement or credit, at Casting's option (¶ 12).

3. Casting must be notified of warranty claims within 30 days of shipment (*id.*).

4. Casting's express warranty "IS EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES EXPRESSED OR IMPLIED, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR USE ..." (*id.*).

If it were established that Gulfco had agreed to abide by Casting's terms, a goodly part of Gulfco's counterclaims would be mortally wounded.[27] Unfortunately for

---

**23.** Gulfco also claims that even if it agreed to master heat certification as understood by Casting, there is a factual question whether Casting's certifications were technically accurate. Gulfco argues Casting had problems with the carbon analysis in its certification (see Holzmann Dep. 97–98), creating a genuine dispute as to the reliability of the certification (G S.J. Mem. 69 n. 33). Quaker–Consolidated have presented no evidence on that point. At this stage, then, a factual issue does exist.

**24.** Gulfco argues separately (citing Bravenec Aff. ¶ 17) that the assorted defects in the parts render them unmerchantable and unfit for their intended purpose (G S.J. Mem. 70–72). Quaker–Consolidated contest the applicability of such implied warranties to the transaction. That whole topic is discussed later in this opinion. Of course Gulfco's reliance on implied warranties is merely cumulative, adding to the already-discussed claimed breaches of express warranties.

**25.** Gulfco's victory on this point is a hollow one. Burrows' affidavit also necessarily calls into question why Gulfco did not reject the parts or exercise its claimed warranty rights soon after the problem was discovered. As discussed later

in this opinion, Gulfco waived the defect by not notifying Casting of the problem promptly.

**26.** "Contracts" is used in the plural because the parties do not really dispute that there were multiple contracts involved (see Q–C 12(e) ¶¶ 29–30, G 12(f) ¶ 12). As the discussion under "Gulfco's Right To Cancel Further Deliveries" reflects, however, Gulfco does contend the parties' 1984–86 relationship should be viewed in global rather than individual contract terms, so that Casting's allegedly flawed performance would entitle Gulfco to cancel all its remaining obligations.

**27.** Such an agreement would not dispose of Gulfco's entire counterclaim. Gulfco also seeks damages for approximately $100,000 worth of goods delivered in 1984 under the renegotiated purchase orders (see Q–C S.J. Mem. 27 n. 14). Those deliveries were unquestionably governed by Gulfco's purchase orders—orders that Consolidated Chairman Charles Kindred ("Kindred") acknowledged on Gulfco's form (G S.J. Mem. 84 n. 42; Kindred Dep. 105–06). As will be seen, Gulfco's purchase order contains a very different set of terms.

·Quaker–Consolidated, that issue too is in dispute.

Quaker–Consolidated contend (1) the contracts between Gulfco and Casting were formed when Gulfco orally accepted Casting's price quote and (2) the terms of the price quote, confirmed by Casting's order acknowledgement, control the transaction (Q–C S.J. Mem. 22–25). Gulfco responds that Quaker–Consolidated have judicially admitted that Gulfco's purchase orders are the effective offers in the case, and Gulfco also says Casting's price quote is legally deficient as an offer (G S.J. Mem. 85–88 and cases cited there). Gulfco then explains how its purchase order preserves all its rights and warranties (see G Ex. 74 ¶ 16) and also "expressly limits acceptance to the terms and conditions stated herein and on reverse hereof" (G Ex. 74). In their turn Quaker–Consolidated reply that the Casting terms control because Gulfco placed phone orders responsive to Casting's price quotes, voicing no objection to Casting's terms (Q–C S.J. Mem. 3–9). Casting promptly sent its written order acknowledgement, and Gulfco's written purchase orders arrived many weeks later (id.; see also Stephanie Heuer ("Heuer") Aff. ¶ 7).

This Court need not wade through the entire maze of arguments and counterarguments to find the material factual dispute that defeats the Quaker–Consolidated motion. On the scenario involved here, it is enough simply to look at the conflicting testimony presented by a single witness: Gulfco's purchasing manager Wagner.

Quaker–Consolidated present evidence that Wagner believed Casting's terms controlled and that, in placing the telephone orders, he never objected to Casting's terms (Wagner Aff. 2 ¶ 8). However, Gulfco counters with (1) deposition testimony by Wagner that he believed Casting was accepting Gulfco's terms and that Gulfco objected to everyone's terms but its own (Wagner Dep. 31–32) and (2) the third Wag-

ner affidavit (see n. 20), which directly contradicts his earlier affidavit by saying it was *not* his understanding that Casting's terms controlled (Wagner Aff. 3 ¶ 10). Although Wagner states he doesn't remember the specifics of his telephone order conversations, he says his routine practice was (1) never to agree to a vendor's terms from a price quote and (2) to inform vendors the order would be confirmed by Gulfco's written purchase order (id. ¶ 7).[28]

Wagner also explains that Gulfco's purchases came in roughly two waves. In November and December 1981 he placed phone orders for one month's deliveries of 33 parts (for which Gulfco later sent backdated purchase orders) (id. ¶ 6). In February 1982 he issued a second set of purchase orders for monthly deliveries of the various parts (id. ¶ 9; see also G S.J. Mem. 10). Casting confirmed those orders by returning the acknowledgement copy of Gulfco's purchase order form as well as by sending its own order acknowledgement (id.).

If this were the trial stage of the case, the internal conflicts in the Wagner evidence as to whether Gulfco ever acceded to Casting's terms would have to be resolved. But for now the pro-Gulfco version of his statements must be accepted and the pro–Quaker–Consolidated version must be ignored.

That being so, the situation is one of a so-called "battle of the forms" governed by UCC § 2–207. Each of Gulfco's and Casting's forms states quite clearly its objection to additional terms proposed by the other (G Ex. 74, Q–C Ex. K). Under UCC § 2–207(2)(c) those statements suffice to keep the deviant terms from the contract. Gulfco's order form also states that it limits acceptance to its own terms and conditions, which also operates to reject Casting's additional terms (UCC § 2–207(2)(a)). That same conclusion is compelled by the

---

**28.** This paragraph's emphasis on Wagner's belief should not be mistaken as embracing a subjective theory of contracts. What was merely in the mind of one contracting party would be relevant only in a legal system that used "meeting of the minds" in kind of a literalist approach to a metaphysical problem. What is

instead significant, of course, is a party's *communicated* rather than its purely subjective intent. In this instance Wagner's habit testimony might rationally be perceived by a factfinder as proof of what he did on this occasion (Fed.R. Evid. 406). If so, Casting's contract terms would not be the only relevant ones.

fact that Casting's additional terms would constitute material alterations under UCC § 2–207(2)(b) (see, e.g., *Album Graphics, Inc. v. Beatrice Foods Co.*, 87 Ill.App.3d 338, 347, 42 Ill.Dec. 332, 339, 408 N.E.2d 1041, 1048 (1st Dist.1980)).

Gulfco and Quaker–Consolidated are therefore left to the result defined by UCC § 2–207(3):

> In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act.

And that means Gulfco holds on, for the time being, to the standard remedies, notification requirements and limitations on actions found in the UCC.

### Implied Warranties

■ Quaker–Consolidated argue implied warranties of merchantability and fitness for a particular purpose do not apply to the Gulfco transaction for reasons over and above the express disclaimer in Casting's documents. No implied warranties arise from defects that an examination of samples should have revealed (UCC § 2–316(3)(b); *Michael–Regan Co. v. Lindell*, 527 F.2d 653, 661 (9th Cir.1975)). Q–C S.J. Mem. 16–18 points to Gulfco's approval of samples that allegedly contained dimensional variations from specifications and surface pitting problems.[29] Once again that is not enough for summary judgment.

First, this opinion has already held Gulfco has raised a factual issue as to whether it waived the stem adaptor cross-holes problem—the only dimensional defect Gulfco has raised (G S.J. Mem. 72). Quaker–Consolidated have submitted no evidence that Gulfco *should* have discovered that problem during its inspection of samples (G S.J. Mem. 95–96).

Second, Gulfco contests waiver of the surface quality problems on sample approval. Gulfco engineer Burrows acknowledges that a pitting problem was identified when samples were inspected, but he says Gulfco approved samples conditioned on Casting's correcting the problem (Burrows Dep. 79, 82; see also G Ex. 39 (Casting's sample approval form)).[30]

Once again this Court does not weigh the parties' comparative likelihoods of success. Gulfco has offered enough to avert summary judgment on sample-approval grounds.

Quaker–Consolidated also contend no implied warranty of fitness for a particular purpose arises when a seller constructs a product according to the buyer's explicit design specifications (see *Lesnefsky v. Fischer & Porter Co.*, 527 F.Supp. 951, 956–57 (E.D.Pa.1981)). But there is no suggestion here that Gulfco was the one that designated the investment casting technique, let alone the manner in which it was practiced by Casting to produce the type of product Gulfco needed (G S.J. Mem. 98–99). Casting rather told Gulfco it was able to produce a fit product for Gulfco's needs through investment casting (see Zugehar Dep. 44). Nor can Quaker–Consolidated rely on Gulfco's never having revealed the entire valve design (Q–C R.Mem. 39–40). Casting knew the components were to be incorporated into Gulfco's valves (Zugehar Dep. 47), and it was not otherwise kept in the dark about how the parts were to be used.

Because Gulfco arguably relied on Casting's assurances that its production technique could produce a fit part for Gulfco's valves, an implied warranty of fitness for a particular purpose is not precluded as a matter of law. Gulfco may well have a long road to travel to show Casting's procedure was itself unfit, but Gulfco has the opportunity to try.

---

**29.** Quaker–Consolidated do not mention the claimed chemistry and certification defects as items that should have been revealed by Gulfco's inspection of the samples. Gulfco asserts those problems could not be discovered when it received the goods (G S.J. Mem. 35–36).

**30.** Casting was to produce the gates and seats in an "unmachined" state (G S.J. Mem. 35). Gulfco, before assembling its valves, would machine down the surfaces of the parts to final dimensions. Thus Gulfco could not readily determine the final surface quality on receipt—that determination awaited further processing (*id.*). According to Gulfco, it approved the samples on the understanding that Casting would add sufficient material to the sealing surfaces so that, on final machining, Gulfco would grind through the area with pitting to get to defect-free surfaces (Burrows Dep. 79, 82; Leonard Dep. 63).

One final threshold issue as to any potential warranty liability must be addressed. Q–C S.J. Mem. 27 n. 14 claims there is no privity of contract between Gulfco and Consolidated as to the goods delivered in 1984 and between Gulfco and Quaker for the goods delivered before Quaker's purchase of Casting in 1983. On that theory each party would be immune from warranty liability for part of Gulfco's claims as a matter of law (see *Spiegel v. Sharp Electronics Corp.,* 125 Ill.App.3d 897, 899, 81 Ill.Dec. 238, 240–41, 466 N.E.2d 1040, 1042–43 (1st Dist.1984)). But the underlying premise is flawed as to each.

■ As for Consolidated, as one of the original parties to the contract with Gulfco it retains responsibility for any warranty obligations under the 1984–86 purchase orders. Its assignment of the obligation to Quaker does not end its own liability (see UCC § 2–210(1); *Tarter v. MonArk Boat Co.,* 430 F.Supp. 1290, 1293 (E.D.Mo.1977), *aff'd,* 574 F.2d 984 (8th Cir.1978)). Quaker–Consolidated have offered no evidence that Gulfco joined in a novation with Quaker and Consolidated so as to relinquish its rights against Consolidated (*Tarter,* 430 F.Supp. at 1293).

■ As for Quaker, normally it would not be liable for goods sold by Casting before the change of ownership. However, the sale of assets agreement between Quaker and Consolidated includes a provision under which Quaker (G Ex. 59 § 9.4):

agrees to provide ... service, repair and replacement as required for all products manufactured and sold or distributed by [Casting] prior to the Accounting Date.... Notwithstanding the provisions of this section, [Quaker] does not assume any of Consolidated's warranty liabilities or obligations to third parties for property damage or personal injuries in relation to [Casting's] manufactured products sold prior to the effective date....

Thus the relevant questions are (1) whether Gulfco's present claim is one for "service, repair [or] replacement as required for ... products" that had been sold by Casting and (2) if so, whether Gulfco is a third-party beneficiary of the commitment by which Quaker undertook those obligations. Because the parties have not dealt with the issues in those terms, this Court cannot now conclude whether Quaker is immune from warranty liability for the earlier Casting products as a matter of law.

### Gulfco's Acceptance of the Parts

■ Quaker–Consolidated argue at length that Gulfco has accepted the parts in issue and then failed to revoke its acceptance (Q–C S.J. Mem. 28–33; Q–C S.J. 12 Mem. 10–25). G S.J. Mem. 74–83 asserts with equal vehemence that it has not accepted the goods. On that score Quaker–Consolidated prevail, for Gulfco has failed to offer evidence it *ever* gave Quaker or Consolidated adequate notice of the rejection or revocation of acceptance of the goods.

Under UCC § 2–602 a buyer must notify its seller of its rejection of allegedly nonconforming goods. Comment 1 to that section says:

A tender or delivery of goods made pursuant to a contract of sale, even though wholly non-conforming, requires affirmative action by the buyer to avoid acceptance.

See also *Presto Manufacturing Co. v. Formetal Engineering Co.,* 46 Ill.App.3d 7, 14, 4 Ill.Dec. 574, 578, 360 N.E.2d 510, 514 (1st Dist.1977) (rejection must come "within a reasonable time and seasonably notify [the seller] to that effect"). In like manner, a buyer must also notify its seller if it seeks to revoke its earlier acceptance of any goods (*Solar Kinetics Corp. v. Joseph T. Ryerson & Son, Inc.,* 488 F.Supp. 1237, 1249 (D.Conn.1980)). Revocation is not effective until the buyer has notified the seller (UCC § 2–608(2)). Notification of rejection or revocation is essential to preserve a buyer's right to refuse payment for non-conforming goods or to recoup any payment already made. Once the buyer is deemed to have accepted the goods it is limited to an action for damages for any non-conformity (UCC § 2–607(2)), a remedy that may well be less attractive to a purchaser.

Gulfco contends it exercised its right of rejection, or at least its revocation of ac-

ceptance, as it discovered the defects in the parts and as Casting said it no longer intended to cure defects as they were discovered (G S.J. Mem. 83). However, Gulfco has not substantiated that claim in evidentiary terms. It points to the parts it returned to Casting periodically with Non-Conforming Material Reports (G 12(e) Response ¶¶ 20–22). But Gulfco admits it reached appropriate agreement with Casting as to all the parts so returned (*id.* ¶ 22(e)). It can cite to no notification to Casting that it desired a blanket rejection of the goods it now claims are defective.

Only one kind of document authored by Gulfco might even arguably constitute the required notice: the pleadings it has filed in this action.[31] Even brief analysis, however, demonstrates they will not suffice for that purpose.

As noted earlier in this opinion, Gulfco's original counterclaims against Quaker and cross-claims against Consolidated state three claims for breach of warranties. Gulfco's sole statement bearing on rejection or revocation is in its Counterclaim ¶ 8, repeated at its Cross-claim ¶ 9, in each of which it "tenders return" of the parts it has on hand. Each of those, however, is part of the general background allegations in Gulfco's pleadings. Every specific count of the counterclaims and cross-claims asserts the right to damages based on breaches of warranty—nowhere does Gulfco assert a right of rejection or revocation to recoup all monies paid to Quaker–Consolidated for the allegedly defective parts.

It is true that Gulfco's amended answer filed in November 1985, which added the chemical, mechanical and certification problems to the list of asserted defects, did contain a statement focusing directly on the issue of rejection or revocation. Counterclaim Count IV ¶ 4 states:

> This lack of certification is a material breach constituting grounds for rejection of the valve components on hand, revocation of acceptance of any previously accepted components, and grounds for cancellation of any obligation which may otherwise exist to accept and pay for additional parts from Quaker Alloy.

Even apart from its untimeliness as the required notice,[32] that single statement—asserted only against Quaker and referring only to the certification problem—plainly does not serve as a total rejection or revocation of Gulfco's acceptance of the Casting parts. It cannot be read as having put Quaker–Consolidated on notice that Gulfco claimed the right to return the disputed goods in toto rather than asserting warranty damages for the diminished value of the Goods.[33]

■ Even though the question of the adequacy of such notice is usually a question of fact inappropriate for summary judgment (see *Boysen v. Antioch Sheet Metal, Inc.,* 16 Ill.App.3d 331, 332, 306 N.E. 2d 69, 71 (2d Dist.1974)), any claimed notice of rejection or revocation via Gulfco's pleadings would be insufficient as a matter of law. Accordingly Gulfco is limited to its assertion of a right to damages for any non-conformity in the Casting parts and has waived its right to reject the goods completely.[34]

---

**31.** None of Gulfco's current filings refers explicitly to its Counterclaim and Cross-claim as its formal notice of rejection or revocation to Quaker–Consolidated. But because this Court must view the pleadings and submissions on the pending motions in the light most favorable to Gulfco, Gulfco will be given the benefit of the doubt on this point for argument's sake. This opinion's next section (that dealing with notice of breach) considers whether pleadings can ever constitute adequate notice of rejection—a matter also assumed arguendo in this section.

**32.** See n. 34 and the discussion in the "Notice of Breach" section of the text.

**33.** Of course this whole controversy could turn out to be of little importance. Were Gulfco eventually to succeed in proving the Casting parts are effectively useless because of the asserted defects, its damages under a warranty theory would be no different from its being entitled to return the goods for a complete refund. All that would be at issue would be which party would have the physical task of disposing of the parts as scrap (the net economics would be the same either way).

**34.** This conclusion makes it unnecessary to address in any detail a number of other issues posed by the parties on the question of acceptance. Some points should be noted, however:

1. Most importantly, Quaker–Consolidated contend any rejection of the goods by Gulfco was not timely. This opinion's next section

### Notice of Breach

To maintain even its breach of warranty claims, Gulfco must establish its timely notification of Quaker–Consolidated as to defects in the goods and its claim of breach (*Wagmeister v. A.H. Robins Co.*, 64 Ill. App.3d 964, 966, 21 Ill.Dec. 729, 731, 382 N.E.2d 23, 25 (1st Dist.1978); see also UCC § 2–607(3)(a)). As with the issue of rejection or revocation, Gulfco has not said just when and how it notified the other parties of its belief that a breach of contract had occurred. But unlike the previous issue, Gulfco's claims as to some (though not all) of the purported defects survive—at least for now—through the filing of its counterclaims and cross-claims in this action.

As with all too many issues on the current motions, the litigants have offered confused and conflicting analyses of the proper focus on the notice-of-breach issue. They resemble nothing so much as the proverbial ships that pass in the night:

1. Quaker–Consolidated argue (a) Gulfco gave no notice of breach until it filed its counterclaims and cross-claims here, (b) such notice via claims in litigation does not satisfy UCC requirements and (c) in any event, Gulfco should have uncovered the claimed defects sooner.

2. Gulfco maintains (a) it gave plenty of notice to Casting that the goods were defective and (b) the parties are really fighting over the timing of Gulfco's discovery of the defects, which it claims was more than reasonable.

To resolve those disparate approaches, this Court looks to UCC 2–607(3)(a):

[T]he buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy. . . .

Timely notice of breach is designed to foreclose claims that a buyer would later assert in bad faith (UCC § 2–607 Comment 4). As for the substance of such notice, Comment 4 goes on to explain:

The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched. . . . The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

Notice of breach must, of course, go beyond merely stating a potential problem with the goods (see *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 971–72 (5th Cir.1976)).

As the UCC § 2–607(3)(a) statement of a "reasonableness" standard suggests, the timeliness (like the adequacy) of notice is a question of fact normally left to the ultimate factfinder (see *Eastern Air Lines*, 532 F.2d at 973). Summary judgment on that issue is appropriate only when the sole reasonable inference is that the notice was unreasonably tardy (see *Goldstein v. G.D. Searle & Co.*, 62 Ill.App.3d 344, 350, 19

deals with the timeliness of Gulfco's complaints about the condition of the parts. But even apart from whether Gulfco has raised a material factual issue on its notice of breach, any purported notice of rejection or revocation by its November *1985* pleading—the only time it even arguably used that terminology—must be held untimely as a matter of law. This is an independent basis for Gulfco's losing on the entire issue.

2. Gulfco has admitted it did in fact accept many of the Casting parts by incorporating them in finished valves (G S.J. Mem. 74). Acceptance of some of the parts (even some of each type of part) does not as a matter of law constitute acceptance of all: There remains a question of fact whether each individual part

is a "commercial unit" that can be separately rejected under UCC § 2–606(2).

3. Quaker–Consolidated contend Gulfco accepted the parts by the purported sale of its inventory to the Ingram Cactus partnership. They have presented considerable evidence that Gulfco has admitted the sale of the contested parts to Ingram Cactus (see, e.g., Gulfco's response to the third set of interrogatories, Q–C Ex. B). Such a sale, as a private sale without notice to Casting, might operate as "acceptance" (see 3 Hawkland, *UCC Series* § 2–711:03 (art. 2)). But Gulfco has sufficiently put in issue whether it did sell the allegedly defective goods to Ingram Cactus (see Scott Bender Aff. ¶¶ 5–8; Gulfco Chairman Roy Claverie ("Claverie") Aff. ¶¶ 18–20).

Ill.Dec. 208, 213, 378 N.E.2d 1083, 1088 (1st Dist.1978)).

In that respect, Gulfco's breach of warranty claims may be viewed as falling into two categories:

> 1. the existence of defects in the parts themselves (giving rise to breaches either of express warranties as to the required specifications or of implied warranties of merchantability or fitness); or
>
> 2. Casting's refusal to accept the return of defective parts when discovered by Gulfco during final production.

Because the timeliness of notice may obviously differ as between those categories, they must be considered separately.

Indeed, the first type of claim (the existence of defects) must itself be viewed as divisible, because the asserted flaws in the parts emerged at different times. Hence this opinion will examine those claims defect by defect, to see whether Gulfco gave notice of breach in an adequate manner and within a reasonable time from when it discovered or should have discovered each defect.

### 1. *Surface Pitting*

■ As discussed earlier in this opinion, Gulfco says it did not discover the surface pitting problem on the GO gates and seats and the G2B gates until final machining. Quaker–Consolidated insist Gulfco could have, and in fact should have, discovered any surface pitting problem at or near the time of receipt of the parts, instead of waiting until it took parts from inventory for final use (Q–C S.J. Mem. 28–29).[35] But Gulfco has proffered evidence that it was acceptable practice in the foundry industry for buyers to return parts to their suppliers for defects uncovered upon use of those parts, rather than on their receipt (see Robert Cunningham ("Cunningham") Aff. ¶¶ 2–3). Casting's Warren Nord ("Nord") also acknowledged in a April 5, 1984 memorandum that it was normal practice to accept returns of defective parts for problems uncovered in final machining of the parts (G Ex. 50).

Even so, Gulfco must fail on its counterclaim and crossclaim for the surface pitting because it gave no effective notice of a claimed warranty breach in that respect until it filed those pleadings in this case. In fact, its memorandum opposing summary judgment does not purport to identify any earlier notice—but to obviate any argument that Gulfco's arguments have done so inferentially, this opinion will explore any potential sources of such notification.

■ First, Gulfco's returns to Casting in 1982 and 1984 of some gates and seats because of unacceptable pitting do not satisfy the notice requirement. Those returns and contemporaneous discussions between the parties about the pitting problem cannot be characterized as a breach-of-warranty notice. Both parties recognize that some percentage of nonconforming parts is inherent to the manufacturing process—something to be expected in the industry. For that reason they had, and followed, a regular procedure for the return to Casting of such unacceptable parts. Gulfco has not even suggested the percentage of such returns was of a magnitude to constitute, in and of itself, a breach of warranty.[36]

That leads to the second step in the inquiry: whether Gulfco's actions after August 1984—when Casting announced it

---

**35.** Quaker–Consolidated also contend Gulfco knew of the surface pitting problem in 1982, long before Gulfco raised the issue either in 1984 or in its 1985 counterclaims and crossclaims (Q–C S.J. R. Mem. 25–29). That argument ignores several points:

> 1. Gulfco has put in issue that while surface irregularities were apparent on the gates and seats as received, Casting had agreed to add enough material to the parts so any defects would disappear on final machining.
>
> 2. Gulfco contends its final inspection of the parts did not accelerate until 1983 and 1984.

> 3. Even if Gulfco knew certain individual parts would be rejectable, it assumed Casting would accept returns of these parts as discovered.

**36.** Quite the contrary is true. G S.J. Mem. 33–34 says the volume of returns to Casting was insufficient to put Gulfco on notice as to the extent of the defect problem. If so, such returns can scarcely have been said to have notified Casting it was allegedly violating its warranties to Gulfco.

would no longer accept returns because they were untimely—served as the required timely notice of breach. Once that happened—once Gulfco knew a dispute existed over its right to return defective parts to Casting long after original delivery—its own duty of timely notice obligated it to apprise Casting that the assertedly defective parts, together with Casting's refusal to take back or otherwise compensate Gulfco for the defects, constituted a breach of warranty.[37] But Gulfco offers no evidence whatever of any such notice until it filed its counterclaims and cross-claims in July 1985 —a full 11 months after Casting had repudiated any obligation to accept further returns.

To be sure, Gulfco contends (1) it was not until December 1984 that it was forced to cancel all further deliveries and (2) negotiations continued even into early 1985 (until Quaker filed suit in February). Those assertions are really not responsive to Casting's unconditional turndown of further returns back in August 1984. But even if Gulfco's scenario is taken at face value, it still waited fully five months after it was actually sued (from February to July 1985) before it apprised Quaker-Consolidated that it was claiming breach of warranties. That period of delay (let alone the 11–month lapse after August 1984) was unreasonable as a matter of law and forecloses Gulfco's claims related to the surface pitting (see *Klockner, Inc. v. Federal Wire Mill Corp.,* 663 F.2d 1370, 1378–79 (7th Cir.1981)). No merchant such as Gulfco can sit silent for many months after a seller has demanded payment, then assert a counterclaim for damages.

Nor, for that matter, can Gulfco's December 1984 letter itself constitute the necessary notice of a breach of warranty (G. Ex. 67).[38] That letter merely told Casting that Gulfco would take no further deliveries because of the dispute over how the parties would handle defective castings. It was not a commercially reasonable notice to Casting that Gulfco considered Casting to have breached warranties as to *previously* delivered goods. Although UCC § 2–607(3)(a) mandates no precise content of notice (see Comment 4), merchants such as Gulfco are held to a higher standard than the average consumer (*Eastern Air Lines,* 532 F.2d at 976–77).

All Gulfco's responsive arguments as to notice of breach are thus clearly wanting.[39] It must be concluded, then, that Gulfco's notice of breach of a warranty as to surface pitting was untimely. Moreover, the unreasonableness of such notice is independently buttressed by the form it took when it finally came—via Gulfco's pleadings in this litigation. Q–C S.J. Mem. 35–36 urges such defensive pleadings do not satisfy UCC § 2–607(3)(a). Although there is no inherent reason that negotiation and settlement (the purposes specified in Comment 4 to that section) cannot also take place after suit is filed, the case law supports the Quaker–Consolidated position. *Armco Steel Corp. v. Isaacson Structural Steel Co.,* 611 P.2d 507, 512–13 (Alaska 1980) reviewed that case law, plus the commentators' uniform view of UCC § 2–607(3)(a), and held the filing of a complaint was inadequate notice.

37. In fact, Gulfco's claimed inability to discover the scope of the defects when it received the goods is all the more reason why it should have told Casting straight away that the latter's refusal to accept the return of defective parts was a breach of warranty.

38. That letter read:
Since Gulfco Ind. Inc. and Casting Engineers could not come to an agreement as to how we should handle the defective castings we have received, we are notifying you and Casting Engineers of the following.
AS OF DECEMBER 12, 1984 GULFCO IND. INC. WILL NOT ACCEPT OR RECEIVE ANY SHIPMENTS FROM CASTING ENGINEERS.

The above policy will be maintained until the quality problem has been resolved.

39. G S.J. Mem. 106–08 also advances an estoppel argument as to such notice generally, saying Consolidated had actual notice of defects in the goods so that further notice from Gulfco was not required. Once again it should be said Gulfco seeks to draw an unsustainable inference from Consolidated's dispute with the other valve manufacturer, Quality Valve (see n. 12). That dispute cannot support Gulfco's assertion that Consolidated was well aware of the defects in the separate parts manufactured for Gulfco.

■ Though no reported Illinois case has dealt with that issue in the context of a dispute between merchants, two decisions (*Goldstein*, 62 Ill.App.3d at 350, 19 Ill.Dec. at 213, 378 N.E.2d at 1088 and *Owens v. Glendale Optical Co.*, 590 F.Supp. 32, 36 (S.D.Ill.1984)) have picked up on a distinction recognized by *Armco* (611 P.2d at 512–13 n. 13): They have contrasted the merchants' situation with that of retail consumers, who operate under a more relaxed notice requirement, and have held the latter *can* give adequate notification of breach through litigation filings. By clear implication that analysis comports with the *Armco* holding that merchants, being held to a higher standard, must give notice of breach outside of their claims or counterclaims in litigation. This Court concludes *Armco* would be persuasive to either the Illinois or the Oklahoma Supreme Court— one of which would set the controlling standard in this diversity action (see "Choice of Law").[40]

### 2. *Stem Adaptors*

■ As already discussed, for present purposes this Court has accepted Gulfco's position that the stem adaptor cross-hole problem was not waived on sample review but was discovered months later after customer complaints (see G S.J. Mem. 35). Quaker–Consolidated have submitted evidence that the problem, once discovered, was corrected simply and Gulfco was able to use the parts (Stewart Stmt. 20; Leonard Dep. 67–68; Omar Ashraf Aff. ¶ 7). Though Gulfco challenges how easily the cross-hole problem was corrected (G S.J. Mem. 35), it has presented no evidence that it ever raised the stem adaptor problem as a defect with Casting until this litigation.

If Gulfco really believed the problem was a potential source of contract breach, it could have raised the issue with Casting long before the filing of claims in this action. There is also no evidence that Gulfco was relying on Casting's willingness until 1984 to accept returns because of stem

adaptor difficulties at any time. On the undisputed evidence, Gulfco's notice of the stem adaptor problem was unreasonably belated. It has therefore waived its right to the cross-hole problem as a breach of warranty.

### 3. *Nonconforming Chemical and Physical Properties; Improper Certifications*

■ Gulfco maintains it was unaware of the chemical, physical and certification problems until this litigation was under way—it says they were latent defects it could not reasonably have discovered sooner (G S.J. Mem. 33–36; G 12(f) ¶ 10). Gulfco offers Bravenec Aff. ¶¶ 18 and 23, which attest to the latency of those claimed defects and to the fact that reasonable procedures by Gulfco would not have uncovered the problems any sooner (see also Leonard Dep. 111–12, stating it is acceptable industry practice to rely on the certifications supplied by a manufacturer).

As for the assertedly inadequate certifications, G S.J. Mem. 35–36 says Gulfco could not have uncovered that problem when the parts were received:

> The improper certifications were not discoverable upon receipt. In this case, the certifications appear to indicate the chemical and mechanical properties of a particular lot of goods (which Gulfco expected), and there is nothing to indicate that the actual data contained on the certifications pertains not to that particular lot but to either (1) the raw material from which it was cast (prior to addition of material which alters that raw material) or (2) a prior production lot of the same type of material. Thus Gulfco did not and could not reasonably have discovered this nonconformity at the time of receipt.[15] (see Casting Engineers Material Certification, Exhibit 51).

[15] In fact, Gulfco discovered the nature of the certification only after entering them in a data base which permitted Gulfco to compare the

**40.** This Court thus holds that litigation filings alone are an unacceptable vehicle for giving notice of breach, but only as to claims of which a party has knowledge before the start of litigation or well before it is required to file a re-

sponse in a lawsuit. As will be seen from later discussion, the case law cited in the text is not applicable when a claim (or knowledge of a claim) arises once litigation is underway.

results between various production lots. At this point it was discovered that the certifications' identified identical results and that these results could not have occurred on different production runs using different added material.

As for the out-of-specification chemistries, G S.J. Mem. 64 claims Gulfco was alerted to a potential problem by certain materials produced by Quaker–Consolidated during discovery (see G Ex. 45, in which a Consolidated consultant identifies Casting's difficulty in controlling the carbon content of its product), and the defect was confirmed by the Bravenec analysis. Finally G S.J. Mem. 30–31 says the internal shrink problem also was uncovered during discovery.

Quaker–Consolidated have challenged the sufficiency of Gulfco's evidence that the various types of defects referred to in this section exist, but they have not contended Gulfco should have uncovered the arguably latent defects earlier (cf. *Environmental Elements Corp. v. Mayer Pollock Steel Corp.*, 497 F.Supp. 58, 61–62 (D.Md.1980) (discovery of latent defects eight months after receipt was reasonable)). And of course once Gulfco has established a material fact issue as to the nondiscoverability of the latent defects, notice to Quaker–Consolidated by claims made during this suit must by definition be timely.

Nor can Quaker–Consolidated complain that notice of such alleged breaches via Gulfco's pleadings here is an unacceptable *means* of notice pursuant to UCC § 2–607(3)(a). Cases such as *Armco* are necessarily inapposite to breaches that cannot reasonably be uncovered until the parties are already in litigation. That contrasts sharply with the situation where a buyer says nothing about *known* nonconformities until the seller sues for payment (see *Klockner*, 663 F.2d at 1378–80). Thus Gulfco cannot be faulted for informing Quaker–Consolidated of these additional claimed breaches of warranty by amending

its counterclaim and cross-claim in November 1985, rather than sending some separate notice of breach.

\* \* \*

Thus different results obtain on the notice issue as to Gulfco's various breach of warranty claims: [41]

1. Material fact issues preclude summary judgment as to the notice regarding (a) the allegedly nonconforming chemical and physical properties of the parts and (b) the assertedly improper certifications.

2. Gulfco's notice was unreasonable as a matter of law as to (a) the surface pitting on the gates and seats and (b) the cross-holes on the stem adaptors.

Consequently Gulfco has waived any right to assert those problems as breaches of warranty.

Despite the partially dispositive nature of those conclusions, the potential for dispositive rulings on other grounds, or for Rule 56(d) issue-narrowing rulings, makes it appropriate to deal with the other issues posed by the parties. This opinion therefore proceeds to consider those issues as well.

### Accord and Satisfaction; Waiver

Quaker–Consolidated essay one final set of arguments for summary judgment on all of Gulfco's counterclaims and crossclaims: They claim the May 1983 Agreement (Q–C Ex. A, G Ex. 53) operates as an accord and satisfaction to release Gulfco's warranty claims for the goods delivered up to that time and, alternatively, that Gulfco's conduct at and since the time of the Agreement has waived those claims.[42] Once more Quaker–Consolidated fail.

Certainly one tenable reading of the Agreement is that it operates as an accord and satisfaction *against* Consolidated. By Agreement ¶ 4 Consolidated gave

---

**41.** Because of the nature of the foregoing analysis on the topic of notice, this opinion need not discuss a subsidiary issue the parties' briefs debate at length: whether Gulfco's complaints to Quaker in 1984 served as adequate notice to Consolidated as well.

**42.** Accord and satisfaction cannot of course apply to the finished goods Gulfco received in

1984 under the renegotiated purchase orders after the Agreement was executed (see n. 27). Quaker does not claim those goods were sold without recourse (see G S.J. Mem. 41–42; Q–C 12(e) ¶ 35), as it does with respect to the work-in-progress to be delivered under the 1984–86 purchase orders (see Q–C S.J. Mem. 37–38). This opinion later deals with the latter issue.

up its rights against Gulfco for the pre-Agreement purchase orders in return for the new set of modified purchase orders and roughly $585,000. But that does not negate the possible simultaneous impact of the Agreement as a settlement of all Gulfco's then-existing claims against Consolidated (see *Geisco, Inc. v. Honeywell, Inc.*, 682 F.2d 54, 57 (2d Cir.1982)).[43]

Just how the Agreement should be viewed is a matter of contract interpretation. As *Koretz v. All American Life and Casualty Co.*, 102 Ill.App.2d 197, 202, 243 N.E.2d 586, 589 (1st Dist.1968) (citations omitted) has put it:

> An accord and satisfaction is nothing more than a contract and should be construed by the rules of law pertaining to contracts.

Most recently *Holman v. Simborg*, 152 Ill.App.3d 453, 456, 105 Ill.Dec. 682, 684, 504 N.E.2d 967, 969 (1st Dist.1987) (citations omitted) has called the parties' intent "of central importance" to this inquiry:

> Thus, a transaction will constitute an accord and satisfaction of a claim only where both parties intend it to have that effect.

It is conventional wisdom that summary judgment is seldom appropriate on issues of intent. It is impossible here, where Gulfco's intent in signing the Agreement is genuinely in dispute.

G S.J. Mem. 109–12 insists Gulfco never intended the Agreement to settle all of its claims against Consolidated, especially potential warranty claims for the goods delivered to date. To that end Gulfco refers to the testimony of participants in the pre-Agreement negotiations (particularly Gulfco Comptroller Kozak) stating warranty and quality issues were not part of the discussions between the parties (see Kozak Dep. I–104; see also Consolidated President John Inman Dep. 183). Clavarie, who became acting president of Gulfco when Ingram took over in 1983, attests to Gulfco's desire at that time to straighten out its account with Consolidated (Claverie Aff. ¶¶ 4–5). Claverie did not intend to waive or release any warranty rights (*id.* ¶ 7). Those submissions put into issue whether Gulfco intended the Agreement, with its payment to Consolidated for all deliveries up to that time, to settle any disputes over the quality of the already-delivered Casting goods.[44]

Again the present posture of the case must be contrasted with an impermissible subjective approach to contract interpretation (see n. 28). Gulfco's representatives' subjective and unexpressed understanding would not negate an accord and satisfaction on warranty issues *if* it were unreasonable for them not to understand Consolidated meant the Agreement to shut off later claims (see *Geisco*, 682 F.2d at 57). But here the objective evidence does not require that Gulfco be charged with knowledge that warranty issues were included. Nothing in the language of the Agreement refers to any release by Gulfco of warranty rights.[45] Although discussions between

---

**43.** G S.J. Mem. 110 also argues the Agreement is not an accord and satisfaction because there was no dispute settled—Consolidated received the full amount owed (see *Germann v. Pekow*, 531 F.Supp. 357, 358–59 (N.D. Ill.1982)). But the Agreement did settle the scope of Gulfco's obligations under the past purchase orders, and Consolidated gave up its rights to require Gulfco to take additional goods under the old orders (Gulfco's financial difficulties surely did not render those rights valueless as a matter of law).

**44.** This is not inconsistent with the conclusion, reached later in this opinion, that no genuine factual dispute exists over Gulfco's agreement to purchase the work-in-progress portion of the 1984–86 deliveries without warranty. Unlike Kozak's unequivocal admissions on the latter subject, no evidence sets out (or even necessarily implies) a comparable understanding as to previously-delivered goods. Hence Gulfco is successful (if narrowly so) in establishing a genuine factual dispute as to a waiver of rights to the pre-Agreement deliveries while it is not as to the unfinished goods to be delivered later.

**45.** Agreement ¶ 4 might create an inference that Gulfco was waiving its claims as to the pre-Agreement deliveries. It specifically acknowledged Gulfco could assert "all rights and remedies which may arise in the future in connection with the substituted purchase orders...." By operation of the familiar "expressio unius ..." principle, that might be read as a waiver of *pre*-existing claims. But that principle is one of drawing negative inferences—and as Quaker–Consolidated seem to forget on occasion, for the present this Court must draw inferences in favor of, rather than against, Gulfco.

the parties on quality issues were taking place at and before the time of the Agreement, there is no evidence of the consolidation of those discussions with the financial negotiations that culminated in the Agreement.

Quaker–Consolidated assert the presumption that an accord and satisfaction covers all matters in controversy between the parties (Q–C S.J. Mem. 38; see, e.g., *Chamales v. Smith,* 10 Cal.App.3d 200, 204, 89 Cal.Rptr. 99, 102 (Cal.Ct.App.1970)). That loses sight of Gulfco's position as to discovery of defects (one this Court is required to credit for the present), which means quality issues were not "matters in controversy" for that purpose when the Agreement was signed. In 1983 Gulfco had raised quality concerns with Casting, but (as already discussed) Gulfco must be regarded as then believing it could return defective parts as they were discovered. Gulfco's arguable contention that many of the alleged defects were not uncovered until well after the signing of the Agreement also supports the conclusion that warranty issues were not subsumed by its terms.

■ Quaker–Consolidated's waiver argument also collapses under the existence of material factual issues. As an abstract proposition of law it is entirely possible that a buyer such as Gulfco can waive warranty rights by its conduct (see this Court's opinion in *Brasco, Inc. v. International Graphic Services, Inc.,* 602 F.Supp. 129, 133–34 (N.D.Ill.1984)).[46] However, the logic of *Brasco* and of all the other cases cited for this purpose by Quaker–Consolidated is that a buyer's actions *in the face of defects known to the buyer* can act to waive claims of breach (see, e.g., *Atlantic Aluminum & Metal Distributors v. Adams,* 123 Ga.App. 387, 181 S.E.2d 101, 103–04 (1971)). This Court has already rejected that premise as to Gulfco because, on the current motions, it must accept that:

**46.** At its core the Quaker–Consolidated waiver argument is an echo of their earlier argument that Gulfco's notice of breach was untimely. This discussion is therefore somewhat abbreviated to avoid unneeded repetition.

**47.** Quaker's complaint originally estimated the amount Gulfco owed on the 1984 deliveries as $69,745.45. Quaker's current motion submits

1. Gulfco was unaware of many of the now claimed defects at the time of the Agreement.

2. Gulfco believed that the defects of which it was aware would be cured by Casting.

Moreover, Gulfco may also draw some comfort from the principle of UCC § 2–512(2), under which payment for goods prior to inspection does not impair any of the buyer's remedies.

This Court therefore cannot conclude that Gulfco's signing of the Agreement, its payment to Consolidated for goods delivered under the earlier purchase orders and its acceptance of goods under the 1984 purchase orders act as a waiver of its warranty claims. Quaker–Consolidated's waiver argument must await the ultimate determination at trial whether Gulfco was aware of any supposed defects in 1982–83 and chose not to assert them.

\* \* \*

All the foregoing discussion has disposed of Quaker–Consolidated's motion addressed to Gulfco's counterclaims and cross-claims. This opinion now turns to Quaker's motion for summary judgment on its complaint—which, mercifully, can be resolved somewhat more expeditiously.

*Shipped Finished Goods*

Complaint Count I alleges Gulfco owes $25,309.98[47] for the shipped finished goods delivered in 1984. Because Quaker's summary judgment motion on that claim mirrors many of the same arguments it made as to Gulfco's counter and cross-claims (see Q S.J. Mem. 5–7), there is no need to repeat the earlier analysis. Instead this Court holds as to the goods Quaker delivered to Gulfco in 1984:

1. Gulfco accepted those goods within the meaning of the UCC by failing to notify Quaker of its rejection or revocation of acceptance of the goods.[48]

uncontroverted evidence of the lower open account figure stated in the text (L.W. Brick Aff. ¶ 9).

**48.** In urging such acceptance, Quaker refers solely to its argument that Gulfco accepted the parts through the sale of inventory to Ingram Cactus, omitting its additional arguments made about Gulfco's acceptance of the pre–1984 deliv-

2. Material disputed issues exist as to whether the parts delivered in 1984 are defective.

3. Disputed issues also remain about the application of implied warranties to the 1984 goods and whether Gulfco has waived any of its warranty rights.

■ One final issue remains on Count I: whether Quaker is entitled to summary judgment in the face of Gulfco's offsetting but hotly-contested claims. Any buyer that has accepted goods is obligated to pay the seller the contract price (UCC § 2–607(1)) and is relegated to a counterclaim for alleged breaches of warranty (see *Frank's Maintenance & Engineering, Inc. v. C.A. Roberts Co.*, 86 Ill.App.3d 980, 984–85, 42 Ill.Dec. 25, 28–29, 408 N.E.2d 403, 406–07 (1st Dist.1980)). Decisions such as this Court's in *Lorenzo Banfi di Banfi Renzo v. Davis Congress Shops*, 568 F.Supp. 432, 433–34 (N.D.Ill.1983) teach Gulfco is thus liable for the purchase price of the goods it has accepted, with its counterclaims viewed as separate from that obligation.[49]

But the litigants in *Lorenzo Banfi* did not pose to this Court the potential applicability of the self-help provision in UCC § 2–717:

> The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.

That issue has been raised by Gulfco here. Though Gulfco has adduced no authority on the issue, this Court's law clerk James Bailinson, Esq. has located *Purofied Down Products Corp. v. Royal Down Products, Inc.*, 87 F.R.D. 685, 688–90 (W.D. Mich. 1980), which held summary judgment for the seller was not appropriate when the buyer claimed a right of set-off under UCC § 2–717.

Gulfco faces a conceptual problem in that respect. While UCC § 2–717 speaks of a buyer's right to deduct "damages resulting from any breach of the contract [by the seller] from any part of the price *still due*" (emphasis added), *Purofied Down*, 87 F.R.D. at 690 draws this conclusion:

> Acceptance of seller's product, and refusal to pay, alone do not necessarily constitute breach.

But there is no necessary inconsistency between the concept that the liquidated amount (the unpaid purchase price) is "still due" to seller and the notion that the unliquidated counterclaim remains to be resolved. And that is particularly true where (as here) the only potential "notice of [Gulfco's] intention to withhold all or part of the price," as required by UCC § 2–717, came belatedly in the form of a reactive counterclaim after suit was filed.

Under those circumstances, partial summary judgment in Quaker's favor for the liquidated unpaid portion of the purchase price appears wholly appropriate. As n. 49 reflects, Quaker cannot obtain the funds represented by that judgment without moving under Rule 54(b), thus bringing into play all the considerations made relevant by that Rule and the gloss placed on it by *Curtiss–Wright* and other cases.

### Work–in–Progress

■ As for Complaint Count II, Quaker's first argument for summary judgment (Q S.J. Mem. 7–8) is that Gulfco purchased the work-in-progress portion of the 1984–86 deliveries "as is" so as to negate all warranties. Gulfco strongly disputes that (G S.J. Mem. 126–27). But as the following

---

eries. This opinion has agreed with one of those other arguments—Gulfco's failure to notify Quaker of its rejection—while finding disputed issues as to Gulfco's sale of inventory to Ingram Cactus (see n. 34). That failure-of-notice contention applies with equal force to the 1984 parts, and it will be treated as controlling here as well, despite Quaker's possible oversight in not specifying it.

**49.** Of course that result does not automatically entitle Quaker to *collect* the purchase price cur-

rently, while the breach-of-warranty counterclaim awaits trial. Because summary judgment for the purchase price would dispose of fewer than all the claims in the case, execution on that judgment could not be pursued without a Rule 54(b) determination. And on that latter score *Curtiss–Wright Corp. v. General Electric Co.*, 446 U.S. 1, 7–13, 100 S.Ct. 1460, 1464–67, 64 L.Ed.2d 1 (1980) provides the authoritative definition of the operative considerations.

discussion demonstrates, Gulfco is unsuccessful in posing any material (that is, outcome-determinative) factual dispute so as to stave off summary judgment in this area.

As the "Facts" section of this opinion has said, the May 1983 Gulfco–Consolidated Agreement provided for Gulfco's purchase of the uncompleted parts held by Casting at 65% of the originally agreed price. Gulfco now insists:

1. Its discussions with Consolidated during negotiations both before and at the time of the Agreement related to Gulfco's obligations to take the parts in their uncompleted state, *not* Gulfco's willingness to take the parts without warranty (G S.J. Mem. 126–31).

2. When Gulfco's Comptroller Kozak acknowledged the letter from Consolidated's Dickey (Q–C Ex. N, G Ex. 57) describing the "as is" purchase of those parts, Kozak was confirming the purchase of the parts without further processing rather than without warranties (G S.J. Mem. 131–32).

Of course UCC § 2–316(3)(a) permits parties to agree to the exclusion of warranties:

[U]nless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is," "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty....[50]

When that provision is coupled with the mandated approach to summary judgment, the question is whether "the circumstances"—with all reasonable pro-Gulfco inferences—"indicate otherwise" as to the work-in-progress. In those terms, this opinion must determine whether it is reasonable to infer that any Gulfco adoption of such "as is" language was intended to refer only to the state of completion of the parts and not to the question of warranty.

In terms of the Agreement itself (Q–C Ex. A, G Ex. 53), neither the term "as is" nor any express disclaimer of warranties is anywhere to be found. Nor do the later purchase orders refer to any disclaimer of warranties (G Ex. 54). Those orders merely add "WIP" to designate parts to be delivered in their present, uncompleted state, with no "as is" specification of those parts.

But that is only part of the story—and not the controlling part. Q S.J. Mem. 9–15 correctly insists the parties' agreement to an "as is" purchase can be found in their contemporaneous understanding of the Agreement. What tip the scales irrevocably against Gulfco are the unequivocal (and candid) admissions by its comptroller Kozak, which jibe entirely with the evidence from Casting's own representatives who made the deal embodied in the Agreement.

Kozak, who represented Gulfco in the negotiation of the Agreement and who later signed the July letter that referred to the "as is" terms of Gulfco's purchase, did testify (Kozak Dep. I–104) that when the Agreement was executed a release of warranty claims "was never a point of discussion. It was never an issue that was ever raised." Kozak's Dep. II–14 similarly said a waiver of warranty rights was neither reflected in the Agreement and the subsequent purchase orders nor discussed orally by the parties.

But Gulfco tries to make too much mileage out of those statements. Kozak's later testimony makes it crystal clear that he was simply being responsive to inquiries whether the *word* "warranty" was used by the parties. Further questioning of Kozak (a non-lawyer) revealed his unambiguous understanding—an understanding that binds Gulfco—that Consolidated would be

50. [Footnote by this Court] In literal terms UCC § 2–316(3)(a) applies only to the exclusion of implied warranties, while Quaker invokes the same principle to exclude *all* warranties. Despite Gulfco's argument to the contrary (G S.J. Mem. 142–43), courts consistently interpret the statute to allow for the disclaimer of express as well as implied warranties when that result is consistent with the bargain struck by the parties (see, e.g., *Universal Drilling Co. v. Camay Drilling Co.*, 737 F.2d 869, 873–74 (10th Cir.1984)). Given the "unless the circumstances indicate otherwise" preface to the statute, that treatment is nothing more than a reflection of normal freedom-of-contract notions.

shipping the goods without further obligation of any kind (Kozak Dep. II–49–51):

Q. Mr. Kozak, at the time you were present at the execution of the May 3rd agreement with Consolidated with regard to purchase order commitments, did you have a meeting with Mr. Charles Kindred who attended to sign that document?

A. Yes.

Q. Now, warranties, per se, were not discussed at that meeting; were they?

A. No, not at all.

Q. Did Mr. Kindred make it clear to you, however, that it was his understanding and wanted confirmation of your understanding that all Consolidated had to do was ship the work-in-process just like it was on the floor, ship what is on the floor in the factory; was that—

A. That was my understanding.

Q. Did he indicate to you that Consolidated did not want to have any responsibilities for any further work or anything that might occur because of further processing of those goods?

A. Would you repeat your question? I'm having trouble.

MR. DOYLE: You want to read that back? (Whereupon the pending question was read back by the reporter.)

THE WITNESS: That's true, yes.

Q. (By Mr. Doyle) You understand, don't you, Mr. Kozak, that when you have work-in-process in any plant, you can't tell until it goes through all of the various processes in a plant which of those products may become internally generated scrap or have other problems as they go through the process; is that right?

A. That's true, yes.

Q. Did Mr. Kindred make it clear that because this was a settlement agreement, that he wanted to have no responsibilities for anything that occurred with that work-in-process, that he just wanted your agreement that he could ship it as it was on the floor?

A. That was the understanding.

Q. Was it clear to you that the obligation of Consolidated was they would ship that product, and you would pay for it?

A. Yes.

Thus Kozak explicitly understood Consolidated's obligation extended to shipment only—no more, no less. It makes no difference that the magic words "waiver" and "warranty" were not used: When asked directly, Kozak expressly acknowledged Gulfco took the parts without reserving further rights against its seller. Indeed, Quaker has submitted significant evidence beyond Kozak's admissions that the other participants in the negotiations leading to the Agreement—and other Casting and even Gulfco personnel as well—understood full well that the sale of the work-in-progress was without warranties or recourse (see, e.g., Kindred Dep. 118; Duane King ("King") Dep. 66–69).

■ Quaker also succeeds in showing the parties' agreement to Gulfco's purchase of the work-in-progress without any further commitment of any kind on Consolidated's part is not in violation of the parol evidence rule (incorporated in UCC § 2–202). Although Agreement ¶ 5 is an express integration clause, an agreement to such an "as is" sale of the uncompleted parts supplements the Agreement on a point on which it is no better than "ambiguous or uncertain" (see *Riemer Bros., Inc. v. Marlis Construction Co.,* 64 Ill.App.3d 80, 83, 20 Ill.Dec. 951, 954, 380 N.E.2d 1160, 1163 (2d Dist. 1978))—if it can be said to carry any inferential support for Gulfco's position at all. All Agreement ¶ 4 says in pertinent part (emphasis added) is:

It is further agreed that any and all rights or remedies *which may arise in the future* in connection with the substituted purchase orders to be issued by the BUYER may be and can be exercised in the future, if applicable.

That language cannot carry the baggage Gulfco tries to load upon it. It does not itself define just which rights "which may arise in the future" are or are not "applicable." Under those circumstances, evidence of the parties' contemporaneous oral agreement to an "as is" purchase serves to explain that no asserted rights stemming from Casting's *past* conduct were to be viewed as rights "which may arise in the future." As such, the evidence is not in violation of the parol evidence rule.

While two post-Agreement letters from Casting's former Vice-president Nord might arguably be read to reflect his own understanding that warranties were not disclaimed for the parts governed by the Agreement, those letters do not generate a material issue in that respect. In January 1984 Nord wrote that Gulfco would have to pay additional sums if Casting were to complete the processing of the work-in-progress. Nord went on to say claims against the parts must be made within 90 days of the invoice date. That assertion of a 90–day notice requirement is perhaps susceptible of differing readings:

1. the more logical one, that if Casting were to perform additional processing rather than simply turning the goods over in their existing condition, one condition of that new arrangement (like the one the parties had followed as to the earlier finished goods) would be a limited return period for unsatisfactory goods; or

2. the other perhaps conceivable view, that all warranty rights had not in fact been disclaimed under their existing arrangement.

Still later, in Nord's May 1984 letter (G Ex. 65), he refers to the purchase orders including work-in-progress and states:

The best we can do as far as a warranty period is one year from date of receipt at your plant.

But Nord was a latecomer to the scene— he did not at all participate in the negotiations with Gulfco that had led to the Agreement, nor is there any evidence that his later involvement in the picture was based on understandings derived from those who did. Nord's arguably ambiguous expressions at a later date cannot cast a cloud (or create a doubt in genuine-material-fact terms) on Kozak's direct confirmation of Gulfco's agreement in May 1983 to an "as is" purchase in every sense: both no fur-ther work *and* no further commitments by Consolidated.

Gulfco has also submitted evidence that its negotiators were not authorized to disclaim warranties for the unfinished Casting parts (Claverie Aff. ¶¶ 7–8, Hughes Aff. ¶ 4). Such an uncommunicated limitation on authority cannot prevail over the specific agreement by negotiator Kozak, even if it were in alleged violation of that limitation. There is really no question that Kozak was delegated the task of negotiating and concluding the various aspects of the parties' relationship: the amount due for previously-shipped goods, the resolution of Consolidated's rights under outstanding purchase orders *and* the disposition of work-in-progress goods. That is surely the hallmark of an agent armed with express authority. But even if what appears to be Gulfco's post-hoc assertion of undisclosed limits on that authority is credited, Q S.J. R.Mem. 3–4 correctly points out that Kozak surely had (at a minimum) ample apparent authority to agree to the terms of the purchase (see, e.g., *Stephens v. Yamaha Motor Co., Ltd. Japan*, 627 P.2d 439, 441 (Okl.1981)).

Because the parties' rights and obligations were defined by the understandings reached when they executed the Agreement in May 1983, and because those understandings negated any further responsibility on Consolidated's part other than to ship the work-in-progress, Quaker is not compelled to rely on its further contention that the July 1984 Consolidated–Gulfco letter acts either as written confirmation of a no-warranty purchase or as an enforceable modification of the parties' contract to incorporate the "as is" term. Nevertheless those arguments are worth a brief look.

First, it is uncontested that the parties understood the letter—the first document to use "as is" phraseology [51]—to be simply

51. This is what the letter (Q–C Ex. N, G Ex. 57) says:

After digesting all of the documents received at your meeting with Charles Kindred at Gulfco on May 5th, I would like to have written verification of our accord on the work-in-process portion of your order. With the exception of minor finishing work on approximate-ly $10,000 worth of castings, all work-in-process (WIP) castings will be delivered as is without further processing for the price indicated on your purchase orders 10R 10554 and 10R 10555, dated May 4, 1983. Please indicate your concurrence with the foregoing in the space indicated below and return the signed additional copy to me.

a confirmation of Gulfco's obligations under the Agreement (see Kindred Dep. 94; Kozak Dep. II–24). Kozak, who signed the document for Gulfco, says he felt he was merely "restating what was already agreed upon" (Kozak Dep. I–104), and he didn't understand the letter to have any impact on warranty rights (Kozak Dep. II–21–24).[52] Thus the value of the letter rests on what Kozak understood the parties' original May 1983 deal had been, a subject already amply dealt with—though it *does* tend to buttress the notion that Kozak's acknowledged understanding also conformed to the UCC's usage of "as is." [53]

Less space is warranted by Quaker's second contention: that the letter acted as an enforceable modification of the Agreement. Although UCC § 2–209 endorses the modification of contracts without need for consideration, Quaker has not submitted a shred of evidence that *anyone* understood the letter to be such a modification. It has not begun to satisfy its burden of proof that there was a "meeting of the minds" to modify the Agreement (cf. *Euclid Engineering Corp. v. Illinois Power Co.*, 79 Ill.App.2d 145, 151–52, 223 N.E.2d 409, 412–13 (4th Dist.1967)). But Quaker does not need to win on this issue, a typical instance of counsel's asserting every possible argument because it cannot be known in advance which the court will find persuasive.

In summary, there is no genuine issue of material fact, and Quaker is entitled to a judgment as a matter of law, as to the purchase price of the work-in-progress goods. Factual issues remain only as to the unshipped finished goods, with respect to which Gulfco has succeeded in creating questions as to the existence of defects.

> I would appreciate your prompt attention to this matter.

**52.** Kozak states at the time he countersigned the July letter he had no idea "as is" could be interpreted to affect Gulfco's warranty rights, and he has been "educated" only since then (Kozak Dep. II–24). As the earlier text quotation of Kozak's testimony later in the same deposition (*id.* at 49–51) reflects, his "education" does not undercut the deal he candidly acknowledged he made when the Agreement was entered into.

## Gulfco's Right To Cancel Further Deliveries

■ Quaker's final argument for summary judgment on Count II (one that might conceivably pick up the portion of its claim that has survived to this point) is that Gulfco's claims of defect in the parts delivered to date do not justify Gulfco's wholesale cancellation of all further deliveries. At least that question is the only one not entirely foreclosed by the prior rulings in this opinion as to the existence of material factual issues.

As this opinion has already discussed, Gulfco and Casting negotiated throughout 1983 and 1984 about Gulfco's claims of defect in the parts. Gulfco then believed it could return parts to Casting for credit or cure when defects were uncovered during its final assembly of valves, sometimes several years after component parts had been received. In August 1984 Casting notified Gulfco it would not accept returns beyond one year from the delivery of parts (G Ex. 62). When further negotiations proved fruitless, on December 7, 1984 Gulfco wrote Casting (see n. 38) saying it would accept no further shipments (G. Ex. 67).

Quaker and Gulfco do not agree whether the 1984–86 purchase orders should be viewed as an installment contract (or a series of them), a collection of individual contracts for the delivery of separate parts or one large contract that contemplated multiple delivery dates. No matter what the characterization, however, Gulfco's right to cancel further deliveries survives a motion for summary judgment. That is so because all the parts Casting was to deliver under the 1984–86 purchase orders are affected by Gulfco's claims that:

**53.** G S.J. Mem. 44–46 also advances an elaborate theory that Quaker intended to use the July letter to trick Gulfco into acknowledging that the Agreement included an "as is" sale to create evidence for future use. This Court does not credit Gulfco's speculation about the origin of the letter, and the argument has played no role in this opinion's resolution of the issue. Nor is it necessary to address Gulfco's additional arguments that the "as is" disclaimer in the July letter was not conspicuous and that Quaker could not disclaim express warranties of description (G S.J. Mem. 141–44).

1. all parts are defective because of the inaccurate and improper master heat certifications;[54]

2. all the parts to be manufactured from the ASTM CA 15 or AISI 4140 alloys are defective because of the high rates of improper chemistries identified by the Bravenec analysis; and

3. the G2B gates are defective because of unacceptable internal shrink.

And those claims, based on the goods delivered to date, would (if proved) create the inference that the goods still held by Quaker are similarly defective (see Bravenec Aff. ¶ 22).[55]

If Quaker and Gulfco's contractual relationship is considered in installment terms, Gulfco's right to cancel further deliveries is authorized by UCC § 2–612(3):

> Whenever non-conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole.

Official Comment 7 to that section confirms that nonconformity that "substantially impairs the value of the entire contract" justifies cancellation of future deliveries. If the contractual relationship is instead considered a series of separate contracts or a single contract with separate delivery dates, each defective shipment would be separately rejectable under UCC § 2–601—which specifies the buyer's right to reject the tender of nonconforming goods. Accordingly, if Gulfco prevails on its claims of defect (and if Quaker does not prevail on its previously discussed waiver arguments) Gulfco's cancellation of further deliveries was justified.[56]

Nor is Quaker aided by its reference (Q S.J. Mem. 25–28) to the waiver clause of UCC § 2–612(3):

> But the aggrieved party reinstates the contract if he accepts a non-conforming installment without seasonably notifying of cancellation....

At least with the already-discussed favorable inferences, Gulfco's December 7 letter to Casting served that purpose. Under Gulfco's version of events, it expressly rejected further deliveries when it became convinced Quaker did not intend to cure claimed defects. Such a notification is sufficient to satisfy UCC § 2–612(3) (see also 3 Hawkland, *UCC Series* § 2–612:06 (art. 2) (discussing seasonable notice of cancellation).[57]

---

**54.** It will be recalled that this opinion (1) has concluded Gulfco has waived the claimed defect in the stem adaptors and the claimed surface pitting defect and (2) has rejected the Bravenec evidence as to a claimed hardness defect. All the parts that would have been rejected for those defects are still covered by the claims as to the master heat certifications.

**55.** Quaker and Gulfco have also executed the following stipulation:

> For the purposes of the pending motions for summary judgment, the goods currently held by Quaker Alloy/Harsco shall be deemed without the necessity of further proof to have been manufactured by the identical process as those goods delivered to Gulfco and to possess the same general characteristics as goods delivered to Gulfco. It is acknowledged, however, that a portion of these goods (some of which have been referred to as "unfinished" or "work-in-process" goods) have not gone through all the operations which were performed on their counterparts which were delivered to Gulfco.

**56.** If Gulfco does not ultimately prove *all* the Casting parts were defective and rejectable, the cancellation issue becomes a bit more complicated. Gulfco contends defects in the majority of parts—especially the gates and seats—would justify the cancellation of the delivery of all further parts because these defects would substantially impair the value of the whole contract (UCC § 2–612(3)). But Quaker has submitted uncontroverted evidence that the value and usefulness of each of the 33 parts is independent of the conformity and usefulness of each other part (see, e.g., Leonard Stmt. 12; King Stmt. 25). That being so, Gulfco cannot rely on the statement of opinion in Cunningham Aff. ¶ 25 that Gulfco would not have contracted with Casting if Casting could not successfully produce critical parts such as the gates and seats (cf. *Bodine Sewer, Inc. v. Eastern Illinois Precast, Inc.*, 143 Ill.App.3d 920, 931, 97 Ill.Dec. 898, 906, 493 N.E.2d 705, 713 (4th Dist.1986) (citations omitted) ("the buyer must present objective evidence that with respect to its own needs, the value of the goods was substantially impaired")). Each part stands or falls on its own. Gulfco will be obligated to take any parts under the 1984–86 purchase orders that are ultimately found non-defective.

**57.** Quaker makes a final separate argument (Q S.J. Mem. 29–30, S.J. R.Mem. 22–25) that Gulfco's breach of warranty defense to its obligations under the 1984–86 purchase orders must be rejected because made in bad faith. That position is grounded on the assertion, made by Quaker and Consolidated several times through-

G S.J. Mem. 125–26 also argues its right to cancel is authorized by what it calls Quaker's "repudiation" of its contractual obligations. Gulfco claims Quaker failed to give assurances pursuant to UCC § 2–609 that it would honor Gulfco's right to return defective goods (that is, a right that existed under Gulfco's conception of the parties' agreement). But Gulfco does not cite any valid request for assurances made to Quaker. Such a demand must be made in writing (*Bodine Sewer*, 143 Ill. App.3d at 930, 97 Ill.Dec. at 905, 493 N.E. 2d at 712). Gulfco's December 12, 1984 letter to Casting is insufficient to that end. It was simply Gulfco's notice of cancellation and cannot reasonably be interpreted as a demand for assurances.

In sum, this Court finds Quaker's motion for summary judgment on Complaint Count II fails as to the finished goods for the same reason as Quaker–Consolidated's motion for summary judgment on Gulfco's counterclaims and cross-claims—the existence of material factual issues. That concludes the summary judgment issues, and this opinion now turns to the parties' cross-motions for sanctions.

### Motions for Sanctions

Quaker seeks sanctions against Gulfco under Rule 11 and Section 1927 on two bases:

1. Gulfco's Answer and Counterclaims, both as originally filed and as amended, are not well-grounded in fact or law because Gulfco's claims of defect are unfounded and its claims against Quaker are otherwise conclusively barred as a matter of law (Q Sanctions Mem. 3–6, 10–13, 16–17).[58]

2. Gulfco's February 7, 1987 "Emergency Motion ...To Compel the Production of Documents" was filed "without an adequate basis in fact and for an improper purpose" (Q Sanctions Mem. 25).

Gulfco responds with its own motion for sanctions under the auspices of Rule 11, also relying on two separate arguments:

1. Quaker violated Rule 11 by filing its motions for summary judgment in the face of clearly disputed material issues of fact (G Sanctions Mem. 11–15).

2. Quaker's own motion for sanctions violated Rule 11 by its unfounded assertion that Gulfco's claims in the case were groundless (G Sanctions Mem. 15–22).

### Sanctions Standards

As amended in 1983, Rule 11 imposes several threshold requirements before any document is filed in a federal court. *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1080 (7th Cir.1987) has identified four separate components of the Rule:

There must be "reasonable inquiry" into both fact and law; there must be good faith (that is, the paper may not be interposed "to harass"); the legal theory must be objectively "warranted by existing law or a good faith argument" for the modification of existing law; and the lawyer must believe the complaint is "well grounded in fact."

Rule 11 operates under an objective standard—an attorney's argument and belief must be reasonable under the circumstances of the case (*Brown v. Federation of State Medical Boards of United States*, 830 F.2d 1429, 1435 (7th Cir.1987)). Subjective good faith—the "empty head, pure heart"—is no longer a valid defense to charges of having infringed Rule 11

---

out these motions, that Gulfco's claims of defect are unfounded and have been raised simply to escape from its obligation to take goods for which it no longer has any need. Although Gulfco has not specifically responded to the "bad faith" argument, its entire response on both summary judgment motions attempts to substantiate that its complaints of defects in the Casting parts are valid and raised in good faith. Whatever may ultimately be revealed on that score, for now it is enough that factual issues remain for later resolution.

**58.** Quaker and Consolidated originally filed their sanctions motion February 5, 1987, but they did not formally present it for consideration until September 1987 together with Quaker's motion for summary judgment (at which time Consolidated withdrew from the motion for the reasons stated in n. 2). Quaker had withheld presentation of its motions pending the completion of additional discovery. This opinion refers solely to the memoranda filed by the parties on sanctions issues beginning in September 1987.

(*Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir.1986)).

It is of course important that Rule 11 not be used "to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories" (Advisory Committee Notes; see also *Brown*, 830 F.2d at 1437). Thus where an argument or a motion has a colorable basis (1) under the factual record in the case and (2) either under existing law or via a proposed extension or modification of existing law, it will not be sanctionable. Relatedly, the outcome of a motion addressed to the merits of a claim is not dispositive as to whether or not that claim was frivolous ex ante (see *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 830–31 (9th Cir.1986)).

Under Section 1927 a court can sanction an attorney who "multiplies the proceedings in any case unreasonably and vexatiously...." *Walter v. Fiorenzo*, 840 F.2d 427, 433–34 (7th Cir.1988) (quoting *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir.1985)) has recently reconfirmed that sanctions under the statute are appropriate when an attorney's actions are objectively unreasonable:

> If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry to be unsound, the conduct is objectively unreasonable and vexatious.

### Applicability of Sanctions

#### 1. Deferred Cross–Motions

Two of the four sanctions claims are easily resolved for the time being. Both Quaker's challenge to Gulfco's Answer and Counterclaims and Gulfco's "you're another" attack on Quaker's own motion for sanctions are properly deferred until the merits of this case are resolved at trial.

First, Quaker's sanctions argument cuts to the core of Gulfco's position in this case by challenging Gulfco's good faith basis for (1) asserting claims that the Casting parts are defective and (2) contending those claims and other defenses to Quaker's Complaint were not waived or otherwise foreclosed. As this opinion's disposition of the summary judgment motions reflects, those issues cannot be fully decided at this stage and—at least in part—must await the ultimate resolution of the material factual disputes.

Second, the fact that some of Gulfco's claims are not so devoid of support as to fall to a summary judgment motion does not of itself compel denial of Quaker's sanctions motion. It is too early to tell whether Gulfco's position is frivolous *in fact*, as Quaker's motion contends. And in turn that means it is too early to tell whether Quaker's motion for sanctions is itself sanctionable, as Gulfco urges.

Indeed, this opinion has already resolved a number of issues against Gulfco and has spoken of Gulfco's precarious position in several other areas. After several years of discovery, Gulfco is able to muster only a meager amount of evidence in support of its claims of defect. That stands in sharp contrast to the considerable evidence presented by Quaker–Consolidated that no defects exist and that such claims were raised only when Gulfco had no need for the Casting components.

At trial the full story will emerge. Witnesses will be evaluated in credibility terms. For example, Gulfco purchasing agent Wagner will be called upon to explain the discrepancies among his three affidavits in the case (it will be recalled his last-minute assertion (Wagner Aff. 3 ¶¶ 7, 10) that Quaker's contract terms did not control the transaction was the evidence that created a disputed issue over the relevant contract terms). Nor is Wagner the only example of a witness who has presented conflicting testimony (see Leonard on the existence of a no-pitting requirement on the gates and seats).

When the complete picture is available, this Court can determine whether Gulfco had an objective good faith basis for the positions it has taken in this case. As the Advisory Committee Notes to Rule 11 suggest, a sanctions motion addressed to the pleadings in a case may properly be resolved at the conclusion of the litigation (see also *Donaldson v. Clark*, 819 F.2d 1551, 1555 (11th Cir.1987)). Similarly, Gulfco's challenge to Quaker's sanctions

motion must also await the ultimate resolution of whether Gulfco's pleadings were in fact sanctionable.

### 2. *Gulfco's "Emergency Motion"*

■ On February 7, 1987 Gulfco filed its "Emergency Motion" to compel Quaker to produce documents relating to the chemical composition of the parts produced for Gulfco. That motion and its supporting exhibits (Q Sanctions Ex. I) said Gulfco had obtained evidence that Casting's certifications were fraudulent and perjured and that several lots of the parts are out of specification (see February 5, 1987 Radke letter, Ex. A to the motion; Gulfco attorney James Toohey Aff. ¶ 2, Ex. B). Gulfco expressed its concern about safety of the parts' continued use, saying it would have to halt such use pending a complete metallurgical testing unless the chemical composition of the parts could be confirmed. In open court Quaker agreed to let Gulfco inspect all documents relating to chemical content (though it contended all relevant documents had already been produced and reviewed by Gulfco).[59]

Quaker now says Gulfco had no good faith basis for the assertions made in its emergency motion. Quaker claims Gulfco used the motion as a tactical response to Quaker's original motion for sanctions filed two days earlier (Q Sanctions R. Mem. 23). In that respect Quaker points to the uncontested evidence that Ingram Cactus (the partnership Gulfco formed in 1986) continued to use the Casting parts for fully eight months *after* the emergency motion was filed (see Claverie Aff. ¶ 21; Burrows Dep. 144–45).

As the earlier summary judgment discussion demonstrates, genuine issues exist over the chemical content of the parts, the accuracy of Casting's certifications and whether Casting was certifying the "master heats" of the parts in a proper manner. Gulfco certainly had reasonable grounds to determine if Quaker had further documentation of the chemistries of the parts, especially in light of testimony that Casting did perform chemical analyses of each foundry heat of parts (see Holzmann Dep. 97–105).

Such reasonable grounds normally mandate denial of a motion such as Quaker's. In this instance, though, two aspects of Gulfco's conduct are sufficiently troubling to call for either the imposition of sanctions or a further explanation as to why Gulfco should escape sanctions under Rule 11.

First, Gulfco couched its motion in emergency terms, yet it proceeded to use the parts for eight more months. Claverie Aff. ¶ 21 says Ingram Cactus was told to stop using the Casting parts only after the Bravenec analysis in October revealed a number of defects. Gulfco obviously forgets that its emergency motion raised the spectre of *criminal* liability on Gulfco's part if it continued to use parts that were dangerously out of specification. Though Gulfco has asserted all along that it used Casting parts only after "thorough inspection" (Claverie Aff. ¶ 21), it has never claimed to have tested the parts for the chemical defects raised in the motion.

That set of facts should be more than enough to support a finding Gulfco could not have made the statements it did in its "emergency" motion without having breached Rule 11. But to exhaust the possibility that a reasonable explanation might insulate Gulfco and its lawyers from such sanctions, this Court will entertain a brief further submission from Gulfco addressing that subject—to be filed on or before June 7, 1988.

---

**59.** Gulfco did travel to Harsco's Pennsylvania facility to look for master heat files that Gulfco believed still existed. As it turned out, any files that had supposedly contained further analyses of the parts' chemical content had been destroyed or lost at some earlier date. Quaker had thus been truthful in its February 9, 1987 representation that it had already produced all relevant documents in its possession. This Court gave Gulfco a further review of the documents in case a second look (in light of the newly-raised concern over inaccurate certifica-

tions) might turn up further relevant evidence. Gulfco's filings on the current motions refer several times to Quaker–Consolidated's loss or destruction of potentially damning evidence, but Gulfco has presented no evidence at all of improper conduct by Quaker–Consolidated— nor has Gulfco formally asserted any discovery (or other) violation has occurred. This opinion has accordingly given no consideration to Gulfco's discussion of the "suspicious" loss of documents.

Second, Gulfco said its motion was based in part on the discovery that Casting's certifications were fraudulent and perjured. Yet when confronted with an interrogatory request by Consolidated on that subject, Gulfco failed to reveal any real basis for its assertions (Response of Gulfco to Second Set of Interrogatories, No. 8, Q Sanctions Ex. H). Gulfco cited only to evidence obtained *after* its February 1987 motion. And even that post-acquired "evidence" does nothing more than suggest Casting occasionally notarized certifications improperly (see Heuer Dep. 275–79). No predicate whatever—either known before the motion (the only relevant date) or learned thereafter—supports Gulfco's bald statement that Casting certifications were fraudulent and perjured.

In its filing on the current sanctions motions, Gulfco says, in conclusory fashion, its emergency motion was well founded and not retaliatory (G Sanctions R. Mem. 13–14). Wishing does not make it so. No further evidence is tendered by Gulfco to show the claims of fraud or perjury were well grounded in fact as a product of a "reasonable inquiry," as Rule 11 specifically mandates.

This Court therefore finds Gulfco violated Rule 11 by the statement in its February 7, 1987 motion that it had reason to believe the Casting certifications were fraudulent and perjured, and likely violated Rule 11 by its statement of an emergency need for further discovery. As soon as the latter issue is resolved, Quaker will be directed to supply an accounting of the attorney's fees and expenses incurred in response to Gulfco's motion. Appropriate procedures will then be established to determine (1) what portion of those amounts is allocable to the sanctionable aspects of Gulfco's motion and (2) whether that allocable portion is a fair measure of the appropriate sanction.[60]

### 3. *Quaker's Motions for Summary Judgment*

Gulfco has moved for sanctions for Quaker's having filed its motions for summary judgment in the face of clearly disputed material factual issues. Of course Quaker does not need to win on its motions to have satisfied Rule 11. Indeed, Quaker's summary judgment motions are a far cry from a case such as *Mossman v. Roadway Express, Inc.*, 789 F.2d 804, 806 (9th Cir.1986), where a moving party failed to provide any evidence showing factual issues are undisputed. In some areas Quaker's motions have succeeded. In other areas its motions have failed, despite substantial evidence supporting its position, because of evidence from Gulfco (or an inference drawn from the evidence) that certainly fell into the arguable category.

These introductory comments are not meant to telegraph this Court's resolution of this aspect of the Rule 11 motions. For such resolution this Court needs further submissions from the parties.

Just as Gulfco has not really addressed the aspect of Gulfco's motion on which the prior section of this opinion has reserved ruling, so Quaker has really failed to address whether it had a reasonable basis for moving for summary judgment. Instead Quaker's copious filings are almost wholly addressed to why it should in fact succeed on its summary judgment motion. This Court established a simultaneous briefing schedule on the summary judgment and sanctions motions. It may be that was why Quaker concentrated—with great (though partially misplaced) confidence—on the merits of its summary judgment motions, rather than posing its argument in the alternative—showing why its summary judgment motions were at least warranted in Rule 11 terms if found unpersuasive by the Court.

Again, just as this opinion has done on the Quaker motion against Gulfco, Quaker is directed to address specifically why its unsuccessful summary judgment motions are not sanctionable. This should not be misunderstood as an invitation for Quaker to reargue yet again the merits of its summary judgment motions—and of course Quaker must also understand that post-hoc

---

**60.** As always, efforts should be made by the litigants to minimize (if not obviate entirely) any enlargement of the issue by the incurring of fees on fees.

rationalizations are to no avail in justifying a motion for Rule 11 purposes (see *In re Ronco,* 838 F.2d 212, 218 (7th Cir.1988) (sanctions not prevented by an argument that could have been made but wasn't)). Quaker should rather focus only on how its motions were warranted by the facts and law of this case.

Accordingly Quaker shall file its supplemental memorandum (including any references to its supporting factual investigation) on or before June 7, 1988. If Gulfco wishes to respond beyond the arguments it has previously raised, its supplemental filing shall be made on or before June 17, 1988.

*Conclusion*

Quaker–Consolidated's motion for summary judgment on Gulfco's counterclaims and cross-claims is denied. Quaker's motion for summary judgment on Count I of the Complaint is granted, and its motion as to Count II of the Complaint is granted as to work-in-progress but denied as to the balance.

Quaker's motion for sanctions is deferred in part and granted in part, as already discussed. Gulfco's motion for sanctions is deferred in part until the final resolution of this case, and in part to await further briefing as to Quaker's summary judgment motion.

This action is set for a status hearing at 9 a.m. June 24, 1988. At that time (1) the parties should be prepared to discuss the future course of this action and (2) both the parties and this Court will review, in light of the further filings called for by this opinion, the appropriate procedures to be followed on the matters reserved for later ruling.